**WORTHINGTON MOWER CO. v. GUSTIN**
(two cases).

Nos. 5483, 5578.

Circuit Court, Third Circuit.

Sept. 28, 1935.

Rehearing Denied Nov. 7, 1935.

THOMPSON, Circuit Judge, dissenting.

———————

Edmonds, Obermayer & Rebmann, of Philadelphia, Pa. (Thomas G. Haight, of Jersey City, N. J., and Harry G. Kimball and Oscar W. Jeffery, both of New York City, of counsel), for appellant.

Howson & Howson, of Philadelphia, Pa. (A. C. Paul, Harold Olsen, and Paul, Paul & Moore, all of Minneapolis, Minn., of counsel), for appellee.

Before BUFFINGTON, DAVIS, and THOMPSON, Circuit Judges.

BUFFINGTON, Circuit Judge.

In the court below, Worthington Mower Company, owner of patent No. 1,398,481 (hereinafter referred to as 481), granted November 29, 1921, to Charles C. Worthington for a gang lawn mower, and of patent No. 1,712,722 (hereafter referred to as 722), granted May 14, 1929, to same, brought suit against Theron L. Gustin, doing business as the Philadelphia Toro Company, charging infringement thereof. On final hearing that court entered decrees dismissing plaintiff's bill for want of equity; whereupon these appeals were taken.

The subject-matter of these patents is what is called a "gang" lawn mower, by

which is meant a number of mowing units, similar to the familiar hand lawn mower but larger, coupled together in gang formation so as to cut a swath somewhat shorter than the aggregate of its individual units, but so related that their action as individual units and as correlated groups will cut the grass under constantly varying surface conditions.

At first view it would seem the proposition was simply one of hitching a number of individual cutting units abreast and then connecting them to a motive power, but a study of the subject shows that the construction of such a successful machine was a much more intricate and difficult problem. In the first place, the cutting units had to be so connected to the power frame as to having a rising and falling movement, that is, one of the cutters was required to be higher up and the other lower down, as the ground required, and this without affecting the base tractive engagement of the ground wheels of any one of the wheels of any unit, which ground wheels were the actuating power of the knives. At the same time a tilting movement was required, which is the lateral, rocking motion each cutting unit has when one of its ground wheels is in a depression or rides over a bump or when both meet a side slope. This tilting must be done without affecting the unit's individual mowing action or without interfering with the free action of any other unit operating with reference to the unevenness of the ground traversed. If this were not done, a revolving cutter, which is intended to be driven by both ground wheels, might be driven by only one of them and that wheel might slip or skid by reason of being overloaded, and so mar the turf. In addition to this, each individual cutting unit must be able to effect a pitching movement, that is, one which would allow the rear part of the mower unit to cut on the uphill and downhill sides of a ground hump. All of these elements of adjustability in mechanism in and of themselves were probably known, but besides these there was an additional factor the necessity for which and the construction of which were not embodied in any machine, namely, a trailing movement, by which each of the units could swing horizontally right or left with reference to the frame and to the other individual units, a movement which occurs when the machine changes from a straight course.

About 1898, Worthington, the patentee, who was an engineer and machinery manufacturer of large experience, made a golf course of his own and his attention was drawn to the problem of economically and properly mowing irregular surfaces. At that time the swath cut was from 38 to 44 inches. He testified that mowing apparatus in use was heavy, slow, and inefficient, and was mostly drawn by horses. Some twelve years later he built a larger golf course and found the same conditions to exist. On going abroad, he found that in spite of the number of large lawns and golf links, no progress had been made in Great Britain, where they still continued to use ordinary lawn mowers. As the result of his study, he developed in his patent No. 1,210,879, not here in suit, a three-unit machine, in which the superstructure was supported by the motor units. Later on he developed a five unit, or five individual cutters, in his patent 481. Subsequently he devised an improvement on this last-mentioned patent and developed a seven-unit machine, or patent 722. What he sought to do was to increase the width of the swath, which was necessary if the time and expense of cutting were to be reduced. He testified that he first experimented with light hand-machines and made a machine having seven units, but he became convinced that the machine units were too light for the surface. In his experimenting, the proof is that he first used the frame of a hay tedder, which is a single bar with a wheel at each end, and to that bar he strung these units in two rows, but found they were apt to interfere with one another in making their rounds, so he changed that so as to have a front row where the respective units were rigidly held in alignment at right angles in the line of travel of the machine. The other row he put in as trailers, and this proved quite successful. He originally had a fifth wheel between the two rows, but later on found that he could use a sulky construction which would do away with the fifth wheel arrangement and make the structure much simpler. The three-wheel machine he developed was horse drawn and was about the limit of a horse's power. When the tractor came in, the proof is that he could use a gang mower with a wider swath; but these tractor machines only had one cutter knife that was about 40 inches long, and that was the limit of their swath. The tractor knife was pushed

ahead of the tractor. It was found, however, that the 40-inch machine was too long to adjust itself to the undulations of the ground and would shave the higher spots. These machines, the proof is, have virtually gone out of use. The gradual evolution of the art is seen in the fact that the width of the swath in the three-unit machine device was 7 feet 6 inches; in the five-unit machine it was 11 feet; and in the seven-unit there was a swath of 17 feet. By the use of these devices and the tractor as a motive power, they can now be driven to a speed of 15 to 16 miles an hour. The proof of the inventor is: "I think mine was the first commercial gang lawn mower introduced in this country. I did not know of any prior to that. I was very fully informed of the equipment used on golf courses since the the introduction of golf in this country and was a member of several golf clubs."

The accompanying drawing, taken from the five-unit patent, 481 (found on page 4 of volume 2 of Record), shows the make-up of that machine:

It follows, therefore, that when the motor is steered to right or left, these front units will follow the new course by turning as a rigid row like a rank of soldiers wheeling right or left. For all the other highly desirable motions the units of the front row are free and accommodate themselves to all manner of ground variations. The frame, colored red,[1] consists of two cross-beams, one over and one in the rear of the ground wheels of the front units, and the three rear units are flexibly connected to the rear beam at separated points (13) by means of a universal joint which permits all four movements. The frame is sustained in erect position by its connection to the tractor agency and is termed by the patent a "sulky frame." It was a new idea, and the use of such frame in a gang lawn mower was first shown in this patent, No. 481, and gives a flexibility when moving across narrow holes or over ridges, permitting high speed.

The next improvement of Worthington was embodied in patent 722, by which he increased the swath from 11 to 17 feet. We recall that in the patent just discussed

The connections between the frame and the units are colored green. The front units have no trailing movement and, therefore, cannot swing horizontally with reference to the frame when the machine is steered on a curve or around a corner.

two units "held square" were used in the front row. In the improving patent we have three units "held square" in the front row, and either two or four mowing units, flexibly connected, making the rear row, so that the three front row construction

may be used with the trailer to make either a five or a seven gang mower. The main draft frame has a hinged frame section at its end, and the unit associated with that section is pivotally connected to it. This makes a double pivotal connection for the terminal cutter of the row and permits accommodation to the ground surface while still being ."held square" in the row. This double pivotal connection is shown in the accompanying drawing as the hinge joint (13) in the frame, which is one pivot, and a fork of the frame post (7) on the axle rod of the unit which works the other pivot. The first pivot permits the drawing unit to move bodily up and down, and the other allows it to tilt, and together they insure a perfect accommodation to ground variations for each end unit.

■■■ Without entering into a summary of other elements of construction, all of which are illustrated in the colored drawing referred to, we may say that these many elements combine to make an efficient gang mower which, from the proofs, appears to be the first in the art to economically and rapidly mow in the one case an 11-foot swath, and in the other a 17-foot one. While many features of patent No. 481 are of course embodied in No. 722, and therefore 722 may be said to be an improvement on 481, yet the fact remains that there are essential elements in 722 which are not disclosed in 481, and these elements are of such a substantial character that 722 can cut 17 feet while 481 cuts but 11 feet. As the combination of both patents was new in the art, as they were both useful and have gone into general use, we are constrained to regard the patents as valid.

■■■ In so holding we have not overlooked the alleged anticipations of patents and the alleged prior uses. The large number thereof shows how the art was seeking to improve lawn-mowing capacity and to supplant in large areas the much used hand lawn mowers. But the fact that in spite of all these efforts, none of them made any permanent use or change in the art and that the small lawn mower continued to be used, proves the problem was not solved and was awaiting solution. We have given due regard to the alleged anticipations of the patents in suit, but none of them comes up to the standard laid down by this court in Skelly Oil Co. v. Universal Oil Products Co., 31 F.(2d) 427, 431, where we said: "A patent relied upon as an anticipation must itself speak. Its specification must give in substance the same knowledge and the same directions as the specification of the patent in suit. Otto v. Linford, 46 L.T.(N.S.) 35, 44. It is not enough to prove that a method or apparatus described in an earlier specification can be made to produce this or that result. Flour Oxidizing Co. v. Carr & Co., 35 R.P.C. 457. A singularly sensible test of the rule of anticipation is given in British Thomson-Houston Co. v. Metropolitan Vickers Electrical Co., 45 R.P.C. 22, by asking the question—'Would a man who was grappling with the problem solved by the patent attacked, and having no knowledge of that patent, if he had had the alleged anticipation in his hand, have said: "That gives me what I wish?"' The Pope Alliance Corporation v. The Spanish River Pulp & Paper Mills, Ltd. (Privy Council Appeals No. 33 of 1928)."

■■■ In the matter of infringement, claims 5, 8, 14, and 25 of 481, and claims 13, 15, 17, 20, 24, and 34 of 722 are here involved.

Referring to defendant's two machines which are alleged to infringe, we find its 2-3 machine has two cutting units in the front and three in the back row, and its 3-2 machine has three cutting units in the front and two in the back row. These machines have used several of the elements of Worthington's patents. The front row of cutters is held rigidly square to the direction of travel. They utilize Worthington's sulky frame. Their trailing units are attached to such frame by flexing joints. Each of such rear units has a lifting lever. The defendant's plan of using two end wheels at each end of its front frame in no way changes or affects the cutting function of the front row of cutters and does not functionally differ from Worthington's plan of resting the frame on the axles of the front units. The same may be said of its substitution of pull links for Worthington's pull links. They are functionally, to use the words of the claim, "unit-connecting members in non-supporting and relatively movable relation to said main frame adapted to connect and hold said unit frames parallel to the vertical plane of said main frame while permitting the tilting of said units in said vertical plane."

The proof is that patent 722 showed "how to solve the problem of putting three units in the front row and yet have them all conform to the surface of the ground,

however it varies in elevation and in angle. This is accomplished by attaching one or both of the terminal units to the main frame by means of extensions of this frame, hinged to the central member." While the improvement shown in 722 over 481 is relatively small, yet it is of such material advantage that both plaintiff and defendant feel constrained to make such 3-2 machine to meet the commercial requirements of the buying public.

Without unduly prolonging this discussion, we are of opinion infringement of both patents has been shown. So regarding, the case is remanded to the court below, with directions to vacate its decree dismissing the bill and substitute therefor one holding the claims in issue of the two patents valid and infringed and directing an accounting.

THOMPSON, Circuit Judge, dissents.