## COLD METAL PROCESS CO. v. CARNEGIE–ILLINOIS STEEL CORPORATION et al.

## CARNEGIE–ILLINOIS STEEL CORPORATION et al. v. COLD METAL PROCESS CO.

### Nos. 6701, 6702.

Circuit Court of Appeals, Third Circuit. June 15, 1939.

Rehearing Denied Nov. 14, 1939.

Writ of Certiorari Denied Feb. 26, 1940.

See 60 S.Ct. 590, 84 L.Ed. ——.

Wall, Haight, Carey & Hartpence, of Jersey City, N. J. (Thomas G. Haight, of Jersey City, N. J., Clarence P. Byrnes, of New York City, Walter J. Blenko, and Wm. H. Webb, both of Pittsburgh, Pa., of counsel), for Cold Metal Process Co.

Merrell E. Clark, of New York City, John E. Jackson, of Pittsburgh, Pa., Charles H. Walker, of New York City, and Lindabury, Depue & Faulks, of Newark, N. J., for Carnegie-Illinois Steel Corporation and U. S. Steel Corporation.

Before DAVIS, BUFFINGTON, and THOMPSON, Circuit Judges.

BUFFINGTON, Circuit Judge.

In the court below the Cold Metal Process Company, assignee of Abram F. Steckel, brought suit against Carnegie-Illinois Steel Company and the United States Steel Corporation, charging, inter alia, infringement of Patent No. 1,779,195, hereafter styled '195, for "method and apparatus for rolling thin sheet like material." As stated therein, "This application is a division of my application Serial No. 648,-761, filed June 30, 1923." It is here noted that said Serial No. 648,761 resulted in the grant of Patent No. 1,744,016, hereafter referred to as '016. On final hearing that court in an opinion reported at Cold Metal Process Co. v. American Sheet & Tin Plate Co., D.C., 22 F.Supp. 75, held patent '195 invalid for lack of invention and dismissed the bill. The court also held patent '016 valid and infringed and from a decree so adjudging the defendants took an appeal. It also appears the Cold Metal Company brought suit likewise charging defendants with infringement of patent No. 1,744,017, hereafter called '017, granted January 14, 1930, to Abram P. Steckel for rolling metal strip, with infringement of patent No. 1,744,018, hereafter called '018, granted January 14, 1930 to Abram P. Steckel for method and apparatus for rolling; with infringement of patent No. 1,-881,056, hereafter called '056, granted October 4, 1932 to William C. McBain for Tension Device. All these cases were consolidated and disposed of in the above stated opinion, so that the situation as to '195, '017, '018 and '056 now is that the bills were dismissed, from which dismissals Cold Metal has appealed. As to '016, which was held valid and infringed, the defendants have appealed. As did the court below, we dispose of all patents in this opinion. In doing so we first consider and dispose of '195 and '016.

In an earlier case between the same parties the United States District Court for the Western District of Pennsylvania, in an opinion reported at Cold Metal Process Co. v. United Engineering & Foundry Co., 3 F.Supp. 120, held patent '195 valid and infringed. Reference to the two comprehensive opinions of the different District Courts illustrates the art and saves needless repetition in this opinion.

As stated in patent '195 specification, "It applies particularly to the rolling of thin sheet-like material in long lengths. It provides a mill which may be operated at high speeds and permits of rolling metal strips of practically unlimited length. In cold rolling I have successfully operated a mill of the character herein disclosed at speeds up to 1200 feet per minute."

It will therefore be noted that we are here concerned first, with the process of cold as contrasted with hot rolling, and, secondly, with a "thin strip" of steel product as compared with thicker steel products.

This distinction between thin strip and thicker steel sheet products and between cold and hot rolling was such as to really evidence two essentially different fields in the steel art and this is strikingly evidenced by the fact that while there were many advances made in heavier steel rolling. there was no advance made in the thin strip art and the method in use when this patent was applied for in 1923 was the same "pack" method in use for two hundred years. In 1908 in the case of Donner v. American Steel and Tin Plate Company, 3 Cir., 165 F. 199, 203, this court had occasion to consider the "pack" process as then used in steel rolling and after considering the uncontradicted proof of the state of the art by men experienced therein, we there held that even with continuous rolling "the packs stick and produce scrap to such a degree as to make such rolling commercially unsuccessful."

Indeed, the inability of a pack process to produce the low gauged finished sheets the art was calling for is shown by the defendants' own proofs in a patent to Cushwa, No. 904,605, wherein the patentee states: "The most commonly employed process of producing sheet and similar metal is to start with a sheet bar which is about 5/8 to 3/4 of an inch in thickness, and 5 to 8 inches wide, and of a length approximately equal to the width of sheets to be formed. These sheet bars are heated and reduced in breaking down rolls, which are ordinarily 2-high rolls through which the plate is fed a number of times. Two or more sheets thus formed are then piled one on the other and rolled down to about 18 to 20 gage. These sheets are then separated or opened up and again piled and reheated to a good rolling temperature and then further reduced. For the coarser gages the packs are doubled one or more times, again reheated and further reduced. This old hand process requires a large amount of labor and repeated reheatings, thus adding considerably to the cost of production. It also results in the production of a large amount of scrap, this being due to the fact that when piled the sheets do not stay in exact position but slip sidewise or endwise and thus result in producing edge portions which are of unequal thickness. If the edges are very thin they do not elongate in the further reduction but are caused to crack. All of these cracked and unequal edges must be sheared off. Furthermore, it is not possible to handle long packs by hand, and owing to the tendency of the sheets to separate and slip they are rolled mostly in lengths from 8 to 10 feet long. At each end of these sheets there is from 6 to 10 inches of scrap which must be sheared off."

Without discussing the art in great detail, the fact is that neither by the old "pack" method, which employed a stand of two rolls to roll heated metal, nor by any known four-roll stand, nor by any continuous roll process, was the art able to make advance in thin strip steel rolling either cold or hot. In that respect we agree with the statement in the patentee's specification that in the divisional application '016 "cold rolling has theretofore been primarily an expensive finishing process, and not a cheap reduction process." The art was stagnant. Why such was the fact will be better understood by a statement of what the "pack" system was and what limitations and objections were incident thereto.

The evolution of the art and the ultimate standardization of "pack" rolling is thus summarized by Clinton H. Hunt, an experienced steel man: "Tin plate manufacture is supposed to have had its beginning, I think, in Saxony, way back probably in 1500 or 1600. As we know it now, it was brought into Wales, and they produced tin plate by taking a piece of crude iron, spreading it out on an anvil or a flat plate and then hammering it with a hammer until it was reduced down to some degree of thinness. They were not able to get it very uniform in thinness nor very thin. Later on they discovered that by putting two pieces together they wouldn't stick together when they were hammered because of the scale between them, so that they put two together and hammered them down and were able to get the two of them by that means a little thinner. They kept on doing that until they were able to produce comparatively thin sheets and not so much variation in roughness or thickness. That went on until about 1740, when some one discovered that they could take these two plates and put them together and roll them between a pair of rolls and get them to the same thinness and better—they would would be more flat and level and have a more uniform degree of thickness. That process has been going on, that is, the making of plate after that fashion—up until the present time, or up until 1922."

As "pack" rolling represents the peak of the working art when the patent in suit was applied for, we here reproduce in reduced

*1* PASSING SHEETS THROUGH FINISHING HOT ROLLS.

*2* RETURNING SHEETS FOR ANOTHER PASS.

*3* MATCHING SHEETS.

*5* DOUBLING SHEETS.

*4* SEPARATING SHEETS.

*6* FLATTENING FOLDED SHEETS.

DIAGRAM OF TWO-HIGH HOT PULL-OVER SHEET MILL.

size an exhibit which illustrates the "pack" method.

The proofs are that these roll stands are called hand mills, that the rolls for tin plate mills are about 2 feet 6 inches in diameter and each roll weighs from fourteen to fifteen thousand pounds. The ends or necks of the roll are of reduced size and revolve in brass bearings. The pressure employed in the process is many thousand pounds.

Referring to the foregoing illustration, the process is thus explained:

"The drawing, Exhibit P-55, represents in general diagram, with substantial accuracy, the several steps involved in pack rolling.

\* \* \* \* \* \*

"The starting material which is employed in pack rolling is known as sheet bar. The sheet bar, as it comes from what we call the sheet bar mill, is usually in thirty-

foot lengths. The sheet bar is cut into sections of the proper lengths to make the width of sheet that is desired. * * *

"When the sheet bar is rolled, that is done in a sheet bar mill. It is rolled on flat rolls and travels in a lengthwise direction through the rolls. The edges of the sheet bar * * * are rounded. It has been compressed from a thicker bar, until reduced to this thickness. Without any rolls on the edge to retain it, or without any pass in the rolls to retain it, it is squeezed out in that form by being reduced. That is to say, the rounded edge which is found on the sheet bar is the result of the hot rolling in the longitudinal direction.

"The first step in the rolling of sheet bars in the process of making sheets on the hand mill is to roll them transversely. The rounded edge goes in between the rolls. The piece issues on the far side of a width corresponding to the length of the sheet bar but somewhat widened out. That is done hot. Two sheet bars are generally handled by the mill at one time. Two bars are taken from the furnace and placed on the stand in front of the rolls. The roller then takes hold of one bar and shoves it through the rolls and the catcher on the other side catches it with his tongs, pulls it back, raises it up, preparatory to sending it back over the top of the rolls. The roller sends the next bar through. The roller, by that time, catches the one that is coming over the top and the catcher has the one that has just come through the bottom. When I speak of the roller and the catcher, I am giving the terminology that is applied to the two workmen on the mill. The man who stands on the entering side is called the roller and the man who stands on the delivery side is called the catcher.

"Exhibit P-55 is somewhat misleading because it shows a piece of considerable length. It shows the piece after the sheet bar has been very greatly elongated. In the early steps that would be relatively short, quite short.

"The sheet bars are reduced in this initial single ply rolling to about one-half the thickness of the bar. They are reduced to whatever thickness the finishing rolls will take—probably less than one-half; quite a bit less than half. Then they put two of them together—take both of the bars and lay one on top of the other. That is to say, these two bars that they have brought up to this point are now laid one on top of the other. They are then given two or three passes through the rolls again.

All of this is done hot and there is no reheating up to this time.

"The second stage of the operation is represented diagrammatically by views 1 and 2 on the Exhibit P-55. This step of laying one of the elongated pieces over the other is called matching. The matched pieces are subjected to the same process, that is to say, fed through the mill, caught by the catcher, handled back and so on. In that stage the rolling is carried forward to the extent of two or three passes.

"In the next step they are returned to the furnace and reheated. Then they are brought back and rolled down on the mill as far as they can go, being limited by the thinness which they can produce. Then they are taken out, placed on the floor and doubled over, as is shown in view 5 on Exhibit P-55. They are taken and pulled right over and the end is tamped down, as shown in view 6 of Exhibit P-55. Now there are four plies of metal. The four plies are taken back to the furnace and reheated."

As stated above, as the bar issues from the rolls the catcher seizes it with his tongs and it is lifted up and handed back over the top of the rolls to the roller on the other side. These operations are continued by further passes until the sheet is reduced to such thickness that it is impracticable to reduce it further. Then two such sheets are "packed" or laid one on top of the other and the rolling continued. After reheating, the metal is reheated, doubled upon itself to make four plies or even eight plies and the rolling continued until the desired thickness is obtained. The proof is that rolling in "packs" was unnecessary because as the art then was it was impossible to roll single sheets with sufficient accuracy.

These immense rolls in their relation to each other necessitate the most delicate adjustments, for this governs the thickness of the rolled product. To that end the roller is a highly skilled man and the proof in that regard is:

"When a roll of a hand mill is originally put into the mill it is turned or ground hollow in the center. That is, the face of the roll is not flat but is concave somewhat like an hour glass. The approximate amount of concavity is about 1/32 to 1/16 of an inch I believe on the one side making a total of about 1/16 of an inch in diameter. As the hot pack or hot sheets are rolled between the roll that heats up the body of the roll and expands it so that the center of the roll expands until the contour

is more nearly flat. That is the reason for having it concave, to take care of that heat expansion. Heat is generated by reason of the friction of the necks of the rolls in the brasses in which they work. If the heat in the necks becomes excessive it will expand the outer edges of the roll body. The workmen have possibly three means for controlling the heating influences. One is the manner in which they roll the bar or the sheet so as not to overheat the rolls, but in case the rolls become overheated they have a steam jet that plays on the body of the roll. That steam is of lower temperature than the body of the roll and cools it down sufficiently so that the gage can be maintained. If for some other reason they want to heat up the roll in some spots they have a gas flame that they can play on the body of the roll to immediately change the temperature. These factors must be controlled in order to get merchantable sheets on the mill. Considerable skill is required in their control.

"In sheet rolling it usually takes a man from three or four to six years to learn the business. Exceptionally bright men might learn it in a shorter time. In tin rolling it requires from four to five years before a man can become an expert roller.

"If we are starting out at the beginning of a week with the mill cold, it requires one turn of about eight hours to properly shape up the mill. That is done by taking narrow strips of narrow sheet bar, I should say, or sheets and working them through the center of the roll until that heat is gradually built up. The workmen keep going a little wider and wider until they are able to roll the full width of the sheet. Then the mill continues to run 24 hours a day until the end of the week.

"If the rolls become unduly large in the middle they will pinch the pack in the middle. In other words, they will elongate the sheet slightly more at the middle of the pack than at the edges. That will cause a buckle. If the rolls are unduly expanded at the edges, the edges of the pack will be elongated a trifle more than the center. That results in what is called a riffled or ruffled pack."

The "pack" process is limited in speed to about 240 feet per minute which the evidence shows is restricted by human inability. The uncontradicted proof is, "We find about 240 feet per minute is about as fast as a man can handle the material through the mill. * * * In pack rolling the men are working under very hot conditions. The roller and some of the others stand between the rolls and the furnaces that heat the steel. The furnaces are hot, the rolls are hot, the roll stand is hot, the floor on which they stand is hot, and the material which they are handling is hot. So that it is really a very warm, uncomfortable place to work. We usually feel that a man begins to slow up pretty much after 45 or 50 years of age. * * * The practical reason for the limitation on the length of the pack is the ability of the men to handle the weight of the bar in the pack and the length of bar which he can handle on account of its flexibility which makes it difficult to get back over the roll. The limitation on thinness of the packs that can be rolled is imposed by the men's ability to control the contour of the pass of the roll to keep it flat enough to produce a merchantable product. The limitation of speed of the pack rolling process is also a man limit. We find about 240 feet per minute is about as fast as a man can handle the material through the mill."

But this was not the only important handicap of the "pack" process. It necessitated several reheatings which made both fuel and labor expense. Added to this were the delay, expense and product risk incident to the several annealing processes which were necessary in order to soften the steel. The "pack" process required several days and annealing or softening of the steel involved risk of steel destruction. In that regard the proof is, "Our average cost of the box annealing would be about four dollars a ton for such annealing. On the high carbon steel it would run around seven and a half dollars a ton for each annealing. Stainless steel would run about twenty-five dollars a ton for each annealing. * * * Any annealing is more or less a hazard. You are subjected to conditions, changes in the furnace, which may cause decarbonization or even crystallization and those sometimes discolor the steel. You have those hazards in any annealing operation—so-called box or pot annealing. Whenever these adverse effects are encountered the material can sometimes be reclaimed, but quite frequently it has to be scrapped." In addition to these factors, there was the all important, additional feature of scrap loss as to which the proof is: "It is customary practice to shear off metal on all sides of the packs after rolling. My recollection is that the scrap loss runs around 11 or 12 per cent. All of that metal must be remelted."

This scrap loss is caused by "buckles" or "riffles". As noted above, these "buckles" and "riffles" are caused by the shape and the changing inter-roll space of the rolls. If the rolls become unduly large in the middle, they will pinch the "pack" in the middle. So also if the rolls are unduly expanded at the edges of the pack a trifle more than at the center edge, "riffles" are caused. The delicacy of roll adjustment is well nigh infinitesimal. Asked what difference in thickness it requires between the edge and middle of metal to cause "riffling", the expert of the defendant testified:

"Q. An extremely small difference of something to be measured only the ten-thousandths of an inch isn't it? A. Yes, that is to say if the strip is thin enough."

A study of the testimony satisfies us that the "pack" process, except by careful sorting of sheets, was not able to meet gauge requirement and commercially a tolerance of eight and ten per cent in desired gauge thickness had to be, and was, allowed.

It remains to consider another hostile factor in the "pack" process, namely, the harmful change of inter-roll relation caused by heat of the sheets and by heat due to neck and housing friction. Up to 1923 in all rolling, whether by "pack" or by hot or cold strip, the housing or journalings in which the neck of the roll revolved were of brass. These brass housings were quickly and considerably worn down. In answer to the question, "Well, you know, as a matter of fact, in some of these old strip mills they had brasses wearing at as high a rate as one-sixteenth of an inch an hour, didn't they?" the defendants' expert answered: "I don't know that that was the exact figure, but they were wearing pretty fast; they had to be adjusted quite often. That is fully correct."

Bearing on that problem, the testimony of an experienced mill operator was:

"Now I want to turn to the question of hot mills. Professor Trinks has testified that roll neck heating was not a problem in the old hot strip mills provided with brass bearings. Is that correct or incorrect? A. In our experience, operating our mills, it was a problem; there was a definite limit to the speed and pressures due to the heating up of the necks on the hot mills.

"Q. It was suggested here that there was no problem because it was open to the workmen to flow water on the roll necks or on the roll bodies. What have you to say to that? A. Which we did. We used water on the necks and we used water on the bodies to the extent that we could use it. Still there was a problem of overheating.

"Q. It has been admitted here that the friction of the brass as used on the roll necks is variable and produces variable amounts of heat. Is that according to your experience? A. Yes, sir.

"Q. Having that in mind, what can you say further as to the efficacy of taking away this variable amount of heating by the use of a flow of water? A. Well, riffling was always a problem on our hot mills, even with water on the necks, and the use of water did not eliminate that difficulty."

The testimony satisfies us that the roll pressure and consequently heat generation was greatly increased in cold rolling wherein the pressure was from one hundred to quarter of a million pounds per square inch with a possible peak of three hundred thousand.

Now it is quite clear that in the years preceding 1923 there was an increasing demand for wider widths and finer gauges of steel, but in spite of the demand no way was found, either by the pack or any known method, to roll at high speed without causing riffles, buckles and intermediate annealings.

Referring to such increased demand, Judge McVicar in his opinion, 3 F.Supp. 120, 121, found as a fact—and there is no finding by Judge Fake to the contrary—that

"Sheets are used for a variety of purposes, as, for example, roofing, the making of utensils and various formed parts. Such material must have a good surface, and is usually under 10 gauge (.1379") in thickness. There was and is a great demand for thin material having a high ratio of width to thickness. Typical products made from such material are radiators and radiator shells; hub caps, stainless steel veneer for steel spokes, light shells, covering for airplane wings, cans, metal ceilings, stampings, toys, weather stripping, razor blades, textile machine parts, etc. A very large tonnage of high-ratio steel is coated with tin to make so-called 'tin plate' for use in tin cans. There is a large demand for tin plate. * * *

"The difficulties of rolling thin metal increase as the ratio of width to thickness increases, and the difficulties become so

marked at a ratio of about 400 to 1 that this figure constitutes a dividing line between high and low ratio material. It is necessary to use extraordinary precautions in rolling high-ratio material, and it has been much more costly than low-ratio material. There has always been a constant demand from the steel manufacturers for mills which would produce more product and better product than existing mills."

Following that period of a quiescent, stagnant state of the art, the fact is that a remarkable and wide change took place about 1923 which change made it possible to eliminate annealing; to roll even cold steel at high speed—in excess of a thousand feet per minute—to eliminate "buckles" and "riffles"; to roll greater widths and finer gauges; to avoid roll variations and roll breaking; to lessen costs and to free workmen from the fierce heat conditions under which the old art compelled them to work.

The great change in the art about 1923 is found as a fact and is well summarized in Judge McVicar's opinion, 3 F.Supp. 120, 124, where, referring to a mill embodying these changes, the court says:

"The Steckel mill vastly extends the possible width of rolling any gauge material, and enables it to be made at much higher speeds.

"The character of the product is superior. It can be rolled within much closer tolerances than by prior processes; the tolerances being 2½ per cent. as against 8 or 10 per cent. in the pack rolling process. The strip produced on the patented mill is much flatter than that produced by old processes, and this means a great saving to the user, because he gets a greater number of lineal feet of strip per pound. It is possible by the patented mill to produce strip having ratios much higher than those previously obtainable. Ratios as high as 11,000 to 1 have been successfully rolled on the Steckel mill.

"The conditions under which the men work are vastly improved.

"The cost of production is greatly reduced. For example, in the case of tin plate the saving in cost is approximately $15 per ton. This is a saving of approximately 20 per cent., which saving is especially high in the steel business, where a saving of even 2 or 3 per cent. is considered one which will justify considerable effort. The saving is due to the fact that few men are required, the mill runs at high speed, and intermediate annealing is eliminated. The cost of annealing amounts to several dollars per ton.

"One Steckel mill displaces two of the old hot tin mills.

"In the case of difficult rollable alloys, such as rustless iron and stainless steel, the manufacturing saving amounts to 50 per cent. or more.

"The patented mill has been used for rolling tin plate, low-carbon steel, high-carbon steel, silicon steel, stainless steel, rustless iron, pure nickel, Monel metal, brass, copper, bronze bimetallic strip, aluminum zinc, and various other alloys.

"It is possible by using the patented mill, and because of the elimination of annealing, to reduce the time required for filling orders. For example, material which would have required three weeks to produce has been produced in four days.

"The public has benefited by the savings obtainable from the use of the patented mill. Since 1925 plaintiff's prices have been reduced by 49 to 65 per cent., whereas the price of standard steel commodities, such as bars, have been reduced only 25 per cent. This comparison shows that the reduction in price is greatly in excess of reductions due to declining commodity prices. * * *

"A large number of these mills are operated by steel manufacturers operating under a license from plaintiff. Among the licensees are Allegheny Steel Company, American Steel & Wire Company, Crucible Steel Company, International Nickel Company, and Weirton Steel Company. Despite the present industrial conditions, Weirton Steel Company has for months past operated its Steckel mill 24 hours a day and has two more such mills on order. The mills are used, not only in the United States, but also in foreign countries, such as England and Sweden. * * *

"Up to August 31, 1932, licensees had paid royalties aggregating over $132,000, most of the royalties being paid at the rate of 5 per cent. of the selling price of the product.

"At the present time the plaintiff has pending negotiations for more than $4,-500,000 worth of mills, and has been visited by practically every important steel manufacturer in the United States and from a large number of foreign countries. A number of foreign manufacturers have come to the United States especially to see

the Steckel mill, and have spent two to six weeks studying it."

That this great change in the art occurred is an unquestionable fact, and that this change was so radical, novel, useful and original as to call for patent protection was, as noted above, held by one District Court; while on the other hand the other District Court held it was a mere mechanical forward step to be expected in the ordinary advance of that art, saying [22 F. Supp. 77]: "I cannot agree that the combining of these old elements called for anything more than an exercise of the skill of one versed in the art," a conclusion diametrically at variance with those skilled in the art whose deep interest in Steckel's mill caused it to be "visited by practically every important steel manufacturer in the United States and from a large number of foreign countries * * * such as England and Sweden. * * *"

Strangely enough, this improvement in the art was not made by one then engaged in steel work, but by an outsider, Abram P. Steckel, who was engaged in other business. He was, however, a trained engineer, having been educated in engineering at Lehigh University, a mechanical training school of high worth.

The proofs show that seeing the great disparity in product prices between cold rolled wire products and hot and cold rolled sheets, he began considering why such was the case. His testimony in that regard is:

"The circumstances leading up to the production by me of my original 4-high roller bearing mill for the manufacture of strip were as follows: In 1922 my attention was drawn to the increasing rate of business being done in cold strip. The high prices obtained for the processing of cold strip made me wonder what made the process so expensive. In the course of finding an explanation satisfactory to myself of why the cold strip process should cost as much as it did, I studied all other workings of cold metal and was much impressed by the wide disparity between the cost of cold working in these cold mills and in wire mills where the cost, judging from the selling prices, showed a disparity for equivalent cold work, which is represented by the difference between seven dollars a ton in wire as against something like a hundred and thirty dollars a ton for the equivalent cold work in cold strip.

"In the cold drawing of strip, pressures of forty thousand pounds per inch of width are common enough in some mills. For each width of the strip which is going through the mill, the pressure would be forty thousand pounds, so that if you were dealing with a piece ten inches wide, the total pressures would then be four hundred thousand pounds, two hundred tons. I am giving what I take to be low figures."

A study of the testimonies satisfies us that the solution of this great difference in product cost was due to the fact, without referring to the obstacles, that as the art then existed the peak of cold rolling strip was some 200 plus feet per minute. As a result of his studies and experiments Steckel evolved the process and mechanism embodied in patent '195. We here note that the patent office required him to make the divisional application—shown in patent '016.

Reference to figures 4 and 5 of patent '016—for both patents concern the Steckel process—will aid in grasping what Steckel really did.

Referring to the existing obstacles in the art and to his method of overcoming them, Steckel's specification in that patent says:

"This invention relates to metal rolling and is particularly valuable for cold rolling metal into thin strip form. It also relates to a new cold process for making economically thin sheet metal hitherto made by hot rolling in packs, notably commercial tin plate, and also contemplates a new and improved product resulting from the practice of the new method herein disclosed.

"Cold rolling, as practiced hitherto, has been so expensive as to limit its application mostly to giving to the metal the high finish which is characteristic of the cold rolling process. The high cost of the process accounts for the practice of producing cold rolled material of any given gage from hot rolled material of only a slightly thicker gage, the reduction being incidental, and determined by the minimum amount of cold rolling necessary to produce the required degree of perfection of finish. Cold rolling has therefore been primarily an expensive finishing process, and not a cheap reduction process.

"In cold rolling as heretofore practiced it has been generally considered necessary to anneal the material after it has been re-

duced to half its original thickness, and as a consequence great reductions by cold rolling have always required a large number of intermediate anneals."

In order to do away with the numerous annealings then required in the art to soften the steel, he states: "In order to prevent such hardening of the strip with the consequent annealing, I use a roll, or preferably a pair of rolls, of comparatively small diameter." These small rolls are called working rolls since they alone come in contact with the passing metal. Referring to these working rolls, the specifications say: "These rolls do not have the necessary strength to be self supporting, and are therefore provided with backing rolls of large diameter and of the necessary strength to withstand the rolling pressure." The backing rolls, as the patent states, "have an anti-friction mounting," which in this case were ball bearings and which, as we later show, were not, and indeed could not have been, used on any existing type of cold roller strip mills or in the pack system by reason of space limitations.

In that regard the proof—and we find no contradiction—is:

"The amount of pressure involved in cold rolling is dependent upon the size of the working roll employed. Other things being equal, that is to say, the mill, the hardness of the material, the width and the reduction to be taken, the pressure necessary goes up with the size of the working roll; not, however, in direct proportion. There are many factors involved and there is no simple mathematical rule for expressing this relationship. Assuming that the work rolls that I used, instead of having backing rolls, were supported in the usual fashion by necks, and bearing in mind the diameter which is shown in respect of the length of the bodies of these rolls, those work rolls were not large enough to be self-supporting under the loads to which they must be subjected. Such rolls, in attempting to do such work as they do in there would bend and break before anything could happen. It would be impossible to do anything.

"In the class of material with which we are here concerned, namely steel having a high ratio of width to thickness, if the mill is to roll material of commercial width it is utterly impossible to apply a high speed anti-friction bearing to the rolls of a 2-high mill adequate to withstand the loads. This is true because the roller bearing of necessity occupies some considerable room radially. The essential parts of the roller bearing, the hardened members and hardened rollers take up considerable room radially and by the time enough radial room has been taken up—and it must all be below the outer arc of the roll—there has been a cutting down of the neck to such extent that the neck is not strong enough to take the pressures that a roll of such large diameter would be setting up to do the work of cold rolling. A roll of this size doing cold rolling ordinarily would have to have a neck two-thirds of the diameter of the roll to stand the pressures, consequently they simply use brasses in 2-high mills because they can be put into the little radial room between the roll necks. That is to say, on a 2-high mill the necks must have a size approximately two-thirds of the diameter of the body in order to prevent their being broken off under the loads. Even then they will deflect, but they are physically strong enough to carry the load without breaking off. The remaining space between the diameter of the neck and the diameter of the body is, as stated above, the only space left available for a bearing, as there would be interference between the bearings of the upper and lower rolls if you went beyond the diameter of the roll itself. In short, you wouldn't be able to bring the rolls together and engage the material, especially in the case of thin material."

And this is not denied, for Professor Trinks, the fully versed expert of the defendants, says that it can only be done on a two-roll mill academically but not practically.

"A. Well I told you before that I will design you a 2-high mill that will do the work if somebody will furnish the money.

"Q. You mean you have had the answer to this problem locked up in your bosom all these years but you never brought it out? A. No, because it wouldn't be commercial, such a mill; it can be done, however.

"Q. You mean academically it can be done? A. Yes."

And on a four-roll mill he admits he got from the patentee the idea of the use of ball bearings on a four-high roll mill.

"Q. It is your position that because it says that the drawing shows an example of the invention that it would be obvious to put roller bearings on the necks of the

backing rolls of a 4-high mill? A. I should say yes.

"Q. How long has that been apparent to you? A. Since about 1925.

"Q. That was after Steckel had told you what he was doing. A. Yes."

The patentee further states: "The anti-friction mounting also permits the strip to be rolled at high speed, it saves so much power that the usual mill drive may be radically simplified or even dispensed with. In the usual cold rolling mill operating on thin material, the power losses in bearing friction commonly amount to about ninety per cent. of the power applied, and necessitate heavy driving mechanism for the rolls."

Bearing in mind the tension feature embodied in the divisional application, '016, we here note that Steckel therein states that his process provides: "This permits the rolls to be driven principally or entirely by the tension on the delivered strip, such tension being exerted by the winding reel or by a subsequent pair of rolls. The delivered strip may, therefore, be maintained under a constant and automatically regulated tension, which is highly desirable in cold rolling as it insures straightness of the product. This tension should be substantially constant to insure uniformity of gauge."

In addition to the foregoing, the specification shows how the process was particularly adapted to the rolling of tin plate (used in immense quantities in tin cans and tin containers) so as to secure the surface necessary for tinning and perfecting the "pickling", so that as the specification states, "the pickling operation is rendered much cheaper both in the metal lost and the amount of acid used may be so thorough as to insure perfect tinning throughout."

On such application patent '016 issued for, inter alia, the four claims, which are

"The process of cold rolling thin metal strips, comprising pulling the strip past a relatively small reducing roll provided with an anti-friction backing roll and maintaining a sufficient tension on the delivered strip to insure its delivery in an unwrinkled state.

"A mill for rolling strip-like material having at least one relative small reducing roll having anti-friction backing roll and means for engaging the issuing material in such manner that the same may be maintained under tension, the mill being arranged to be driven largely by such tension on the delivered material.

"A mill for rolling strip-like material having relatively small reducing rolls with anti-friction backing rolls and means for engaging the issuing material in such manner that the same may be maintained under tension, the mill being arranged to be driven largely by such tension on the delivered material.

"A mill for rolling strip-like material having relatively small reducing rolls with anti-friction backing rolls and a reel for engaging the issuing material in such manner that the same may be maintained under tension, the mill being arranged to be driven largely by such tension on the delivered material."

Bearing on these claims we note their language is clear and unambiguous. While the specification, referring to the adaptation of his disclosure to the rolls then in use, states, "The reducing rolls are much smaller than those commonly employed in rolling mill practice, and should for ordinary work be less than six inches in diameter, preferably from two to four inches", yet the earlier description of his device gives its broad generic statement: "In order to prevent such hardening of the strip with the accompanying annealing, *I use a roll, or preferably a pair of rolls, of comparatively small diameter.* These rolls do not have the necessary strength to be self supporting, and are therefore provided with backing rolls of large diameter and of the necessary strength to withstand the rolling pressure." (Italics ours.)

So that there is no claim restriction to a six inch working roll and no stressing reason why such limitation should be read into the claims. Moreover, the specification states: "The present invention is not limited to its preferred embodiment or to the details herein illustrated and described."

Now the underlying questions before us are, first, Was the working combination disclosed by Steckel novel? In that regard we have the prima facies created by the issue of the patent, and this is strengthened by the fact that the patent grant was made at the end of interferences and protracted litigation which afforded the patent office full information on the entire subject matter. In considering the prior

art as embodied in the many patents cited to show lack of novelty in Steckel's combination, we here note case of Skelly Oil Co. v. Universal Oil Products Co., 3 Cir., 31 F.2d 427, 431, where, speaking for this court, Judge Woolley admirably stated the test as follows: "A patent relied upon as an anticipation must itself speak. Its specification must give in substance the same knowledge and the same directions as the specification of the patent in suit. Otto v. Linford, 46 L.T. (N.S.) 35, 44. It is not enough to prove that a method or apparatus described in an earlier specification can be made to produce this or that result. Flour Oxidizing Co. v. Carr & Co., 35 R.P.C. 457. A singularly sensible test of the rule of anticipation is given in British Thomson-Houston Co. v. Metropolitan Vickers Electrical Co., 45 R.P.C. 22, by asking the question—'Would a man who was grappling with the problem solved by the patent attacked, and having no knowledge of that patent, if he had had the alleged anticipation in his hand, have said: "That gives me what I wish?"' The Pope Alliance Corporation v. The Spanish River Pulp & Paper Mills, Ltd. (Privy Council Appeals No. 33 of 1928)."

This was restated in this circuit in Worthington Mower Co. v. Gustin, 3 Cir., 80 F.2d 594, petition for certiorari denied, 297 U.S. 725, 56 S.Ct. 500, 80 L.Ed. 1008, and in American Safety Table Co. v. Singer Sewing Mach. Co., 3 Cir., 95 F.2d 543, 550, certiorari refused, 305 U.S. 622, 59 S.Ct. 82, 83 L.Ed. 397.

Patent No. 1,360,959, issued November 30, 1920 to Kriwan for "a rolling-mill with supported working rolls," is cited and as to which defendants' expert, Professor Trinks, in answer to the question, "What is your best reference among the patents and publications that you have referred to?" answered, "There are several which are almost equally good, but I refer to the Kriwan patent.

"Q. What are the others that you consider equally good? A. Almost equally good is, for instance, the Cushwa patent and the Mann patent. I would like to add the Gibbons patent also."

A study shows that Kriwan's patent was not addressed to cold steel rolling and makes no reference whatsoever to that problem. As shown in the herewith figure of the patent the roll to which Kriwan

A. KRIWAN

ROLLING MILL WITH SUPPORTED WORK-ING ROLLS.

Application Filed Dec. 28, 1916.

1,360,959.     Patented Nov. 30, 1920.

5 Sheets—Sheet 1.

Fig. 1.

*Inventor.*

*Arnold Kriwan.*

By

*Howson & Howson*

*Attys.*

referred and sought to improve has not the flat, unbroken, single pass rolls of the cold roll steel practice of Steckel's patent, but was a five pass, grooved, tapered roll such as is used in bar rolling. In that regard the specification says: "Figure I is a vertical longitudinal section of a two-high rolling mill *with five different sizes of passes,*" and claim 3 is, "In a rolling mill, a *working roll and a supporting ring therefor,* said ring rotating on a fixed axis parallel to that of the working roll together with anti-friction bearings between said ring and its fixed axis." And claim 4 has for a combination element, "In a rolling mill, a plurality of *stepped.* working rolls having a series of passes of *different* dimensions." (Italics ours.)

These excerpts and others that might be mentioned throw no light on the cold rolling art to which Steckel's process was addressed and show that Kriwan's patent was merely to provide friction lessening rings on a set of indented tapering working rolls of an ordinary multi pass system.

Without entering into detail as to the other anticipations cited by defendants' expert, Dr. Trinks, it suffices to say that the

Cushwa patent above referred to was not addressed to cold rolling, the specification referring to the process as "thus dispensing with cold rolling to finish" and expressly stating that the process was one dealing with heated metal "and then while still at the *same heat,* passing the plate so produced singly through tandem mills consisting of a sufficient number of stands of small sized rolls to reduce the same to finished guage." So also the patent of Mann, No. 46,371, was not addressed to cold rolling and though granted in 1865 and expiring in 1882, made no impress on the art. And patent No. 1,571,545 to Gibbons, applied for July 14, 1924 (a date subsequent to Steckel's application, viz., June 30, 1923), was not addressed to the cold rolling problem confronting Steckel. It concerned the improvement of rolls used in a factory operation which, as stated by Gibbons, "made it easy for the operator to pass from one side to the other," and where "if the motor is employed it is connected to the pinion 48 through a suitable clutch 50 located where it is accessible to the operator." Indeed, Gibbons summed up what he had in view in these words: "It will be apparent from the foregoing description that I have devised a simple and efficient mill having an *improved* drive for the rolls, that this drive occupies a minimum of space so that the mill is much narrower than the ordinary mill, and therefore, requires much less space in the factory. Furthermore, it is easier for the operator to pass from one side of the mill to the other as it does not require him to walk around a long drive mechanism. Furthermore the drive mechanism for the rolls may be swung to one side out of the way to allow for easy insertion or removal of the rolls, and the rolls may be changed without moving the housings thus doing away with the necessity of resetting the housings after the new rolls have been placed in position, and effecting a material saving in the time required to change rolls and place the mill in operative condition again."

It is quite evident that Gibbons' disclosure made no reference to the possible cold rolling of steel strips hundreds of feet long, and his roll was so diminutive in size as compared with Steckel's, as to allow its single operator to work both sides of the rolls which could be readily disconnected, the patent stating: "It is also an object of the invention to so arrange the drive for the rolls that it may be moved out of the way to facilitate changing of the rolls, and which also makes the mill much narrower, requiring much less room and furthermore, makes it easy for the operator to pass from one side to the other." To allow any such construction to anticipate Steckel's disclosure is contrary to common sense. Indeed, far from the prior art showing any light on the cold rolling made possible by Steckel, such prior art and its teachings were such that when Steckel's process was described to the prior art, it regarded his process as simply impossible and stamped it with an inelegant but forceful estimate.[1]

Without further discussing other patents, exhibits, alleged prior uses and

---

[1] This refers to the testimony of Professor Trinks, who in addition to holding the Professorship of Mechanical Engineering and writing extensively, had varied employments in the steel industry. His testimony is illuminative in four respects, first, his estimate of the worth of Steckel's process; second, the validity of his disclosure; third, the novelty of Steckel's use of ball bearings; and, lastly, the distrust of the art of the worth of Steckel's process. Bearing on these various matters Dr. Trinks says:

"A. I have a better recollection of my first meeting than I have of the second. Mr. Steckel came in to my office, introduced himself and told me that he had read my publications and had from them come to the conclusion that we were rolling thin material by an entirely wrong method. I asked him what his method was to overcome the wrong and he told me that he intended to pull thin material between small rolls and he held his fingers and thumbs together, thereby roughly indicating rolls of something like 2 inches in diameter. After thinking awhile, I said: 'But if you do that, the rolls will spring apart.'

"He said, 'No, they won't because I back them up by larger rolls.'

"Again I thought awhile and said, 'Yes, but then you will pull the strip in two on account of too much friction.'

"And he said, 'No, I won't, I will arrange the mounting of the backing rolls in such a way that there will not be enough friction to pull the strip in two.'

"And then he asked me what I thought of it. After thinking awhile I told him something like this:

"'I believe you have something new, or something good,' something of that sort, 'and it is worth being tried in practice.'

"Whereupon he said, 'Thank you for the encouragement because so far everybody else to whom I have talked about it said I was a damn fool.'"

other matters, all of which have been duly considered, we agree with the reasoning, findings and conclusions of Judge McVicar, which he thus stated (3 F.Supp. page 129):

"Defendant contends that the patent in suit is invalid for lack of invention over the prior art. Steckel's combination of old elements, working rolls, backing rolls, and anti-friction spaced roller bearings, adjusted and apportioned in size, produced a new and useful result in the rolling of strip steel of high ratio at high speeds which required an exercise of the inventive skill. * * *

"The patent in suit is not anticipated by the Kriwan patent 1,360,959, or by the Coryell patent 1,737,185, or by any of the patents or publications cited by defendant."

It remains to consider whether the Steckel process involved invention. In that regard Judge McVicar held in 3 F.Supp. 120, 125: "Working rolls, backing rolls, and roller bearings were in the art prior to the Steckel invention. Steckel was the first person to adjust, apportion, and size these elements in a rolling mill so that the cold rolling of high-ratio strip steel could be done with high speed. Steckel discovered a new combination of old elements which produced a new and useful result."

On the other hand, Judge Fake held (Cold Metal Process Co. v. American Sheet & Tin Plate Co., D.C., 22 F.Supp. 75, 78):

"I am not unmindful that Steckel may have been the first to use the roller or anti-friction bearings in a mill of the exact proportional dimensions as that set out in his patent, but, since the use was no more than that expected of a skilled mechanic, he must rest content with the thought that he was the first mechanic who happened on the scene with a full equipment of the proper implements to smooth out or thin down strip steel. He did not make the implements. He merely used them skillfully for the purposes intended. The major cause of his success, in so far as this patent is concerned, was not his inventive talent but the inventive talent of the father of the roller bearing, and, as was said in the Cold Metal Case, all the elements he chose to employ were old and well known. It will serve no useful purpose here to cite the teachings of the prior art as separately applied to each of the minor elements which went into Steckel's combination. The fact that they were old is conceded.

"In thus concluding that this patent is invalid for want of invention, I am not unmindful that I view the whole combination after the event and that some of our greatest inventions are extremely simple after the inventor has explained them. Nor am I forgetful that in close cases the measure of success has tipped the scales in favor of validity, but I have found nothing in the record here which weakens the conclusion that mere skill was involved. Moreover, I cannot agree with the opinion in the Cold Metal Case, supra, wherein it is held that Steckel's combination 'produced a new and useful result.' It is my opinion that Steckel produced no new result. He did produce an old result quicker, to wit, thin strip at greater speed, but in doing so no new principle was involved. Each of the elements of his combination performed as they had in the past, and the result was clearly foreshadowed by the state of the art prior to Steckel."

After full consideration, we are of opinion that Steckel's disclosure involved invention of a high order. In the first place it was utterly at variance with the views of the then art and was regarded as foolish. However, on its being put in practice, it attracted the attention of steel men both here and abroad, and led to their coming from this Country and Europe and for days studying its workings. It was adopted by steel workers here and abroad and is now being used. Its worth and its novel, useful and inventive character have led to the taking of licenses by numerous great companies and to negotiation for licenses by a larger number of the other large companies. It has in volume of product, in speed of production, in lessened scrap waste, lowering cost of production, in eliminating annealing, in lessening of gauge, in cost of labor, fuel, time of production and freeing men from working in torrid heat and "mankilling" work, effected a revolution in cold rolling steel production. All of these and other elements that might be added have been of great service in those other varied great and useful subsidiary industries whose basic element is sheet steel of proper finish and necessarily of exact desired gauge. In this vast field of wide use it has been a great contributing effect in aiding these various defendant industries which are bedded on the use of cold rolled steel sheets of required gauge and finish. Bearing on the fact, which cannot be gainsaid, of speeding up steel production from one hundred and forty to nine and even twelve hundred feet per minute, and of doing so in days as contrasted with weeks, in avoiding

many operations and the three weeks required in the "pack" process, we may refer to Eibel Process Co. v. Paper Co., 261 U.S. 45, 43 S.Ct. 322, 67 L.Ed. 523, which concerned the strip paper art and which in several details is similar in principle to the present case. There, as here, the old machines could not increase speed because that made "riffles" in the paper strips. By an adjustment of one of the members of an old combination, the patentee's $125,000 increased mechanism production was 20 per cent. As contrasted with these figures, Steckel swelled production from about 140 feet per minute to about 900. Applying the principle there laid down by the Supreme Court, "Speed which increases production is therefore of the highest importance," Steckel's patent had for its avowed purpose the increase of speed. Moreover, large increase of production has always been recognized by the Supreme Court as a basis for patent grant. In Webster Loom Co. v. Higgins, 105 U.S. 580, 591, 26 L.Ed. 1177, it was so held, the court saying: "It was certainly a new and useful result to make a loom produce fifty yards a day when it never before had produced more than forty; and we think that the combination of elements by which this was effected, even if those elements were separately known before, was invention sufficient to form the basis of a patent."

Indeed, when, as here, there was not only signal increase in production of hitherto unattainable gauge and unattainable width and finish—for such is the finding of the trial judge, viz.: "The Steckel mill vastly extends the possible width of rolling any gauge material and enables it to be made at much higher speeds."

The cold roll mill of Steckel, embodied in patent '195 and the pull or tension rolls of '016 being divisional patents, we find valid and therefore hold the court below erred in holding '195 invalid, but not in error in holding '016 valid. The court below in holding '195 invalid, regarded the use of roller bearings as all important, saying, "This * * * strikes at the gist of Steckel's patent" and "moreover, the use of roller bearings, whether placed in a two, three or four high rolling mill, amounts to the same thing in the last analysis, and nothing more than the skill incident to the art is required to suggest their use in either set up. * * * What more simple, then, than the installation of roller bearings which would eliminate the friction in the mills and speed up their production?" The

court was under the impression that all of real substance that Steckel did was to take the four stand mill, then in very limited use on the pack rolls, and put roller bearings in such mills. With due respect to the trial judge, we are of opinion this view did not sense the situation confronting the steel industry. We have seen that there was a great and growing demand for finer gauges of steel and for steel of a certain finish. Ball bearings had been in use for twenty years, but no one had shown how they could be used in cold rolling. Their reduction of friction was well known and evidently utilized in many arts. Manufacturers of them advertised their merits and suggested their use in rolling mills and indeed their ability to build a mill using them. But no one, either the advertiser or the steel art, acted on such suggestion. Moreover, what Steckel did was not the mere putting of ball bearings in an existing mill, but was so radical and revolutionary as to necessitate the building of new mills costing immense sums of money. No successful high speed cold rolling mill was built and the art still went on using the old "pack" system and the relatively slow speed four-stand mills.

It was likewise shown that no one had used roller bearings in the four-high mill then in use. In that respect Professor Trinks, defendants' expert, testified: "I can at present think of no reference to a 4-high mill with anti-friction bearings through which the material is pulled entirely or largely by the action of the strip." Subsequently he referred to the Ward mill and the Keating mill which have been discussed above. There is no showing that either of these mills was driven "largely" by tension on the delivered strip. It is proven beyond question that in each case it was necessary to resort to intermediate annealing, just as it had been practiced in the art from its conception. A prior device, in order to anticipate, as held in Coffin v. Ogden, 18 Wall. 120, 124, 21 L.Ed. 821, "must have been complete, and capable of producing the result sought to be accomplished; and this must be shown by the defendant."

The result of all this was that Steckel did, and was forced to, devise some new roll construction which afforded sufficient space to permit the use of ball bearings. The opinion nowhere recognizes that his process made *cold* rolling commercially possible and profitable and avoided the periodic annealings which were practiced in

the then art. It was these factors—factors the court below did not discuss—which caused the wide commercial price difference between wire rolling at $7 per ton and steel sheet rolling at $130 per ton. This wide cost chasm Steckel bridged by a cold rolling process, which speeded production from 140 to 1000 feet a minute; eliminated heat; did away with annealings; and which Judge McVicar so tersely and so adequately stated in his fact finding.

As we have seen, the court below held the pull or tension patent '016 considered as a unit was valid. But that overlooks the fact that such pull or tension device was per se useless unless it was coupled with the four-high mill of the '195 patent. So also the '195 stand of rolls, considered as a unit, was helpless unless '016 moved, speeded, controlled and handled '195's 1000 per minute strips. These two mechanisms, the cold roll four-high mill and the pull or tension device, while resulting in two divisional patents conformably to the patent office requirement, interrelatedly constituted Steckel's disclosure and the two separate individual units, viz., the cold rolling '195 and the tensioning '016 patents must be borne in mind if the worth of Steckel's disclosure is to be appreciated.

In view of the length of this opinion, we limit ourselves to stating, without discussion, that we find defendants infringe patents Nos. '016 and '195. It is true they have in their larger mills found they could use both working and supporting rolls of larger dimensions than Steckel illustrated in his early work, but the relative proportion of the rolls to each other has been adhered to and the differences have been such that the relative size relation has been used or, as well summarized by Judge Fake, 22 F.Supp. 75, 80, in reference to their larger mills, while "the proportionate diameters of their working rolls, when compared with the diameters and lengths of their backing rolls, are 'relatively small.'"

We next consider patent to Steckel '017, which the court below held invalid for reasons set forth at large in its opinion. We find nothing in it of an inventive character. As we have seen, the advance made by Steckel was given him in patents '016 and '195. All that Steckel disclosed in '017 was at best but an engineering improvement which naturally suggested itself as Steckel's '016 and '195 disclosures were put in use. So also in Steckel's patent '018, which shows the use of wipers to prevent objectionable grit, the use of wooden guides and the reversing of the rolls and also the reversing mechanism shown in McBain's patent '056. We regard all these improvements—if such they were—as would naturally fall under the head of engineering as contrasted with inventive creations.

So regarding, we hold patents '016 and '195 valid and infringed and patents '017, '018 and '056 as non-inventive and therefore invalid.

The decree of the said District Court in this cause is hereby affirmed, with costs, in so far as it refers to United States Patents No. 1,744,016, No. 1,744,017, No. 1,744,018 and No. 1,881,056; but reversed as to that portion which refers to United States patent No. 1,799,195.