COLD METAL PROCESS CO. v. AMERICAN SHEET & TIN PLATE CO. et al.

Nos. 4817 and 4906.

District Court, D. New Jersey.

Feb. 4, 1938.

Wall, Haight, Carey & Hartpence, Thomas G. Haight, and George G. Tennant, Jr., all of Jersey City, N. J. (Byrnes, Stebbins, Parmelee & Blenko, of Pittsburgh, Pa., Clarence P. Byrnes, Walter J. Blenko, and William H. Webb, all of Pittsburgh, Pa., of counsel), for plaintiff.

Lindabury, Depue & Faulks, of Newark, N. J., by Emory C. Risley, of Newark, N. J. (Merrell E. Clark, D. Anthony Usina, John H. Jackson, and Charles H. Walker, all of New York City, of counsel), for defendants.

FAKE, District Judge.

This is a patent suit in which questions of validity and infringement are directed to five patents, all of which are now owned by the plaintiff corporation. Four of these patents were originally issued to Agram F. Steckel; to wit, No. 1,779,195, No. 1,744,016, No. 1,744,017, and No. 1,-744,018, and the fifth was issued to William C. McBain; to wit, No. 1,881,056. They will be considered here in the order above set out, and references thereto will be by use of their last three numbers only.

## Steckel No. '195.

This patent discloses that the original application therefor was filed on June 30, 1923, and thereafter on December 9, 1929, a divisional application was filed upon which the patent was allowed on October 21, 1930. Divers questions are raised based upon alleged differences between the original application and the patent as finally issued. It will not be necessary for present purposes to pass upon the questions thus raised, since taking the patent as granted, which includes all that was contained in the original application, my conclusion is that the patent is invalid.

To the end that the reasoning which leads to invalidity may be more easily followed, an example claim of the patent will be considered as the premise upon which the reasoning is based.

## Claim 17.

"A mill for rolling sheet or striplike material of substantially uniform thickness, comprising a working roll of substantially uniform diameter in the body portion, backing rolls of larger diameter and antifriction mounting for said backing rolls, the backing rolls having diameters more than twice the diameter of the working rolls, whereby excessive 'crown' in the product is avoided, and the backing rolls being also of sufficient diameter to permit of using an antifriction mounting of a character to withstand the rolling pressures encountered and to operate for extended periods of time at speeds which are on the order of multiples of speeds commonly employed in the rolling of such material."

This patent was held valid in Cold Metal Process Co. v. United Engineering & Foundry Co., D.C., 3 F.Supp. 120, 129, the court there being convinced that "Steckel's combination of old elements, working rolls, backing rolls, and anti-friction spaced roller bearings, adjusted and apportioned in size, produced a new and useful result in the rolling of strip steel of high ratio at high speeds which required an exercise of the inventive skill." An examination of the state of the prior art as carefully considered in the Cold Metal Process Case, supra, and as well an examination of the additional evidence produced in this trial, leads me to agree that Steckel's combination was made up entirely of old elements, but I cannot agree that the combining of these old elements called for anything more than an exercise of the skill of one versed in the art. The success which Steckel attained in rolling out extremely thin strips of steel with this mill is largely dependent upon the coming into the market of properly constructed roller bearings intended and designed for the particular use to which he put them. In 1902 Mossberg & Granville issued a catalogue in which they offered roller bearings for sale. A reading of this catalogue discloses the teaching that an " * * * important difficulty overcome by roller bearings is the overheating of bearings under a heavy load or high speed." This strikes at the gist of Steckel's patent.

It was well known before Steckel that friction at the necks and bearings of rolling mills, occasioned either by speed or pressure or both, resulted in the heating of the operating surfaces of the rollers as used in rolling mills, and this heat further resulted in the faulty alignment and retardation of the working rolls which culminated in the turning out of defective material. What more simple, then, than the installation of roller bearings which would eliminate the friction in the mills and speed up their production? It is my opinion that this amounts to no more than the use of the best-known implement designed for a specific purpose, and one skilled in an art is called upon to know the separate items found among the implements of his trade and the reasonable uses to which they may be applied. The Standard Machinery Company (successors to Mossberg & Granville) issued a catalogue in 1920 in which they said:

"Roller Bearings:—One of the most important features in our Rolling Mills is the application of our patented roller bearings to the journals of the rolls. This feature enables us to build a Mill

which will do its work faster than the ordinary plain bearing Mill with just about one-half of the driving power.

"The roller bearings on the roll journals eliminate practically all of the friction that exists in a plain bearing housing, and further there is no heating of the rolls, which sometimes involves frequent delays to cool them."

This again strikes at the gist of Steckel's patent teaching specifically the use to which Steckel put such patented roller bearings. Moreover, the use of roller bearings, whether placed in a two, three, or four high rolling mill, amounts to the same thing in the last analysis, and nothing more than the skill incident to the art is required to suggest their use in either setup. See Northern Trailer Co. v. La Plant, 8 Cir., 21 F.2d 696, at page 698.

I am not unmindful that Steckel may have been the first to use the roller or antifriction bearings in a mill of the exact proportional dimensions as that set out in his patent, but, since the use was no more than that expected of a skilled mechanic, he must rest content with the thought that he was the first mechanic who happened on the scene with a full equipment of the proper implements to smooth out or thin down strip steel. He did not make the implements. He merely used them skillfully for the purposes intended. The major cause of his success, in so far as this patent is concerned, was not his inventive talent but the inventive talent of the father of the roller bearing, and, as was said in the Cold Metal Case, all the elements he chose to employ were old and well known. It will serve no useful purpose here to cite the teachings of the prior art as separately applied to each of the minor elements which went into Steckel's combination. The fact that they were old is conceded.

In thus concluding that this patent is invalid for want of invention, I am not unmindful that I view the whole combination after the event and that some of our greatest inventions are extremely simple after the inventor has explained them. Nor am I forgetful that in close cases the measure of success has tipped the scales in favor of validity, but I have found nothing in the record here which weakens the conclusion that mere skill was involved. Moreover, I cannot agree with the opinion in the Cold Metal Case,

supra, wherein it is held that Steckel's combination "produced a new and useful result." It is my opinion that Steckel produced no new result. He did produce an old result quicker, to wit, thin strip at greater speed, but in doing so no new principle was involved. Each of the elements of his combination performed as they had in the past, and the result was clearly foreshadowed by the state of the art prior to Steckel.

"An improvement to an apparatus or method, to be patentable, must be the result of invention, and not the mere exercise of the skill of the calling or an advance plainly indicated by the prior art. Electric Cable Joint Co. v. Brooklyn Edison Co., 292 U.S. 69, 79, 80, 54 S.Ct. 586, 78 L.Ed. 1131. The inclusion of a flywheel in any form of mechanism to secure uniformity of its motion has so long been standard procedure in the field of mechanics and machine design that the use of it in the manner claimed by the present patent involved no more than the skill of the calling. See American Road-Machine Co. v. Pennock & Sharp Co., supra, at 41 of 164 U.S., 17 S.Ct. 1 [41 L.Ed. 337]. Patents for devices for use both in the motion picture art and in the art of sound reproduction, notably the Holst, the Bell & Tainter, the Dragoumis patents, and the Edison application, already noted, plainly foreshadowed the use made of the flywheel in the present patent, if they did not anticipate it. The patentees brought together old elements, in a mechanism involving no new principle, to produce an old result, greater uniformity of motion. However skillfully this was done, and even though there was produced a machine of greater precision and a higher degree of motion constancy, and hence one more useful in the art, it was still the product of skill, not of invention. Hailes v. Van Wormer, 20 Wall. 353, 368, 22 L.Ed. 241; Grinnell Washing Machine Co. v. E. E. Johnson Co., 247 U.S. 426, 432–434, 38 S. Ct. 547, 62 L.Ed. 1196; Powers-Kennedy Contracting Corp. v. Concrete Mixing & Conveying Co., 282 U.S. 175, 186, 51 S. Ct. 95, 75 L.Ed. 278." Altoona Publix Theatres v. Tri-Ergon Corporation, 294 U. S. 477, at page 486, 55 S.Ct. 455, 458, 79 L.Ed. 1005.

See, also, Motion Picture Patents Co. v. Calehuff Supply Co., Inc., 3 Cir., 251 F. 598, 602, 603; J. F. Rowley Co. v. Rowley, 6 Cir., 39 F.2d 865; Fisher Governor

Co., Inc. v. C. F. Camp Co., 10 Cir., 40 F.2d 341; Saunders v. Allen, 2 Cir., 60 F. 610.

The evidence and the arguments presented in the instant case differ very materially from those at the trial of the Cold Metal Case, supra, and this accounts very largely, if not entirely, for my inability to follow a natural inclination to agree with the opinion in that case.

### Steckel No. '016.

In passing upon Steckel No. '195, reference is made supra to an application filed by Steckel on June 30, 1923. The patent now to be considered was issued on that same application.

In the year 1922 Steckel began a study of the subject of the cold rolling of steel, particularly with relation to thin strip. He found a wide difference in the cost of production between the cold rolling of strip steel and the cold drawing of wire, the latter being produced at a much lower cost, and in this connection he conceived the method which I believe to be of so high an order as to meet the requirements of patentable invention. The gist of it is the pulling out of extremely thin sheets of metal through the use of rollers properly designed for the purpose, the energy or pull being applied largely to the strip and not to the rollers of the mill as theretofore practiced. Thus he ushered in a wholly new and novel method of procedure, one not successfully accomplished before he originated it, and its usefulness is fully proven by the financial success following upon its use. In his patent Steckel refers to it as "making economically thin sheet metal hitherto made by hot rolling in packs," and, speaking of the difficulties experienced in the prior art, which he sought to eliminate, he says: "In cold rolling as heretofore practiced it has been generally considered necessary to anneal the material after it has been reduced to half its original thickness, and as a consequence great reductions by cold rolling have always required a large number of intermediate anneals." To obviate these intermediate heatings or anneals, he provides roll pressures which, while they permit the elongation of the strip passing through the mill, do not exert so high a pressure on the strip as to harden the same and thereby make reannealing necessary. The example claims of the patent read as follows:

23. "The process of cold rolling thin metal strips, comprising pulling the strip past a relatively small reducing roll provided with an anti-friction backing roll and maintaining a sufficient tension on the delivered strip to insure its delivery in an unwrinkled state."

26. "A mill for rolling strip-like material having relatively small reducing rolls with anti-friction backing rolls and a reel for engaging the issuing material in such manner that the same may be maintained under tension, the mill being arranged to be driven largely by such tension on the delivered material."

The foregoing claims, when read in connection with the claims in Steckel No. '195, will be found to furnish an additional element, to wit, "maintaining a sufficient tension on the delivered strip to insure its delivery in an unwrinkled state * * * the mill being arranged to be driven largely by such tension on the delivered material." It is right here that patentable invention occurs. It arises in the pulling out of the strip as distinguished from rolling it out entirely by power applied to the rolls of the mill as theretofore practiced. I found, in passing on Steckel No. '195, that the mill alone did not constitute a patentable invention. I now find that, when such a mill as that covered by the claims of No. '195 has added to it the further element above described, such additional element reaches the dignity of patentable invention. This patent is therefore valid.

### Infringement.

The defendants contend that they do not infringe Steckel's patent No. '016, since they follow the Coryell patent, No. 1,618,515. This patent was applied for by Coryell in May of 1921 and was granted February 22, 1927. It is therefore earlier than Steckel. It shows that Coryell was familiar with the advantages to be obtained in the use of rolls of small diameter in rolling steel, just as Steckel disclosed in his patents above considered, but Coryell's teaching differs from that of Steckel's No. '016, in that Coryell's method consists of a combined pulling with a simultaneous compression rolling of the strip under power applied to the rolls as the strip passes through the mill, while Steckel teaches the method of pull applied to the strip resulting largely in the op-

eration of the mill. Example claims of Coryell's patent read as follows:

5. "The method of greatly extending the length and greatly reducing the sectional area of a piece of ferrous metal, by subjecting the transverse portion of the metal simultaneously to a compressive stress between reducing rolls and to the tensile stress applied by a pulling device over which said piece has been looped, each stress being at about the elastic limit of the metal and being applied progressively, simultaneously each with the other, along the length of the piece."

6. "The method of elongating a piece of metal to more than five times its original length without reannealing the piece, which method consists in simultaneously applying to the piece successively from point to point along its length tensional and compressional forces each in the neighborhood of the elastic limit of the metal directed at an angle to each other so that the resultant force within the metal has a greater value than either of said component forces."

■ Reference to the drawings accompanying this patent and the specifications in reference thereto show that a heavy compression is exerted on the work rolls of the mill and that these rolls are "driven as usual," which means under such power as to pass the strip forward through the rolls as theretofore practiced. All that Steckel can attain, therefore, over Coryell is what he has claimed in the operation of the mill "largely" by tension on the delivered material or strip. This teaches that the power or energy applied to the strip must be greater than that occasioned by the power applied to the rolls. I cannot accept the idea that Steckel should be so limited that the power applied at the rolls must be so light or inconsequential that upon the breaking of the strip the mill would stop. This would amount to holding that *all* the power required to pass the strip through the rolls and thus operate the mill must be applied to the strip. His patent gives him a greater advantage than that.

It will not be necessary here to enter into an elaborate description of the defendants' mills which it is alleged infringe Steckel's patent. It is sufficient for present purposes to say: These mills are very large, but the proportionate diameters of their working rolls, when compared with the diameters and lengths of their backing rolls, are "relatively small," as Steckel and others before him have taught. They have antifriction bearings and are known in the trade as 4-high mills. All of which is old in the art.

As set up, the defendants' mills consist of, first, the mill itself as above described to which power is applied at the working rolls amounting to 33,500 pounds in compressing and rolling the strip forward; second, a winding up reel in front of the mill exerting 8,100 pounds of forward pull upon the strip; and, third, an unwinding reel at the rear of the mill exerting a back pull against the mill of 31,000 pounds. Is this mill a pull mill "driven largely by * * * tension on the delivered material," as claimed in Steckel's patent No. '016 (See claim 26), or is it a mill covered by the Coryell patent, wherein and whereby the strip is "elongated" by "simultaneously applying to the piece successively from point to point along its length tensional and compressional forces * * * directed at an angle to each other"? (See claim 6.)

■ It is my studied conclusion that the defendants' mills do fall within the claims of this Steckel patent, because they are "driven largely by * * * tension on the delivered material," and I arrive at this conclusion by an examination of the mill, arranged as above described, wherein it is found that the working rolls exert a downward revolving forward moving pressure on the strip of 33,500 pounds, which downward pressure and forward movement is impeded or retarded to the extent of 31,000 pounds by the back pull exerted at the unwinding reel. Subtracting this back pull from that exerted by the mill leaves 2,500 pounds of downward rolling forward movement at the working rolls before the action of the forward or winding up reel is considered. The winding up reel then comes into play with a straight forward pull of 8,100 pounds. It follows that the mill is driven "largely" by this forward pull applied to the strip. I can see no reasonable or useful function whatever in the enormous back pull exerted by defendants' unwinding reel except to overcome the unnecessary power applied to the working rolls. In this connection Coryell does not teach, either in his specifications or in his claims, anything more than the application of compressional and tensional forces at right

angles and the care to be given to the elastic limit of the strip. Nowhere does he suggest any such back pull as defendants' unwinding reel exerts. At line 35 of his specifications he says: "Thus as demonstrated by me, when a high tension is in one direction and a large compression is at substantially right angles thereto there is produced a greater resultant force within the steel. * * *"

### Steckel No. '017.

 This patent was issued on an application filed shortly after the application in Steckel No. '195; to wit, on September 13, 1923. It is not concerned with the pull mill or antifriction backing features dealt with in the patents hereinbefore considered. It deals with the lateral flow or widening of the strip. Claims 6, 8, 9, and 10 are in suit. Claim 10 will be used as an example claim.

Claim 10. "The process of making metal strip which includes subjecting the metal to cold rolling in a plurality of passes, embodying small supported rolls, and subjecting the metal to tension during the rolling operation, thus reducing the metal to materially less than half its original thickness, the rolls being of sufficiently small diameter to substantially eliminate widening of the material while rolled under such tension."

A reading of the claims in suit discloses that the gist of this patent resides in the use of small supported rolls for the purpose of reducing the material or strip to "materially less than half its original thickness, the rolls being of sufficiently small diameter to substantially eliminate widening of the material." There was nothing new in this. In the year 1875, one Lauth, in dealing with an improvement in a hoop rolling mill in patent No. 172,457, disclosed the same idea in his specifications, when he said: "For some reason or other a small roll will spread the hoop less than a large one. * * *"

Moreover, the use of small rolls is a feature in the Steckel No. '195 patent hereinbefore considered and found invalid. Coryell taught the use of small rolls before Steckel. He said at line 25 of his patent: "Somewhat greater elongations can be made, * * * if small diameters of rolls are used."

This patent is invalid because its disclosure was old in the art at the time the patent was issued.

### Steckel No. '018.

 This patent, after providing the use of small work rolls as hereinbefore considered, provides for "passing the material back and forth" between said rolls. This amounts to no more than reversing the action of the mill and does not constitute patentable invention.

### McBain No. '056.

 This is a combination patent dealing with a reversing rolling mill with a reel in front and a reel in back thereof, alternately acting as winding up and paying out reels, having combined therewith any mechanism whether electrical or mechanical for utilizing the energy created by the pull on the unwinding reel to assist in advancing the strip being worked through the mill. An example claim reads as follows:

Claim 12. "The combination with working means adapted to progressively treat an elongated piece of work, of holding means on opposite sides of said rolls for moving the piece while under tension to and fro relative to said working means, one holding means pulling and the other holding back during one direction of travel of the piece and reversely the former holding back and the latter pulling during the opposite direction of travel, and means for supplying energy during each direction of travel from the holding means holding back on the piece to the holding means pulling on the piece."

The gist of this patent resides in the means for supplying energy as above described. The defendants assert that the same was anticipated by an article appearing in the Journal of the Union of German Engineers for July 2, 1927, and prior to the application for the patent in suit, which bears date July 5, 1928. A translation from the article, after mentioning a mill driven by a reversing motor and a setup of reels substantially as above outlined, reads: "The pay-out reel motor is so controlled that it acts as a generator and pumps the energy back into the Ward-Leonard circuit, while the winding reel motor takes an equivalent current from the Ward-Leonard circuit. Neglecting the insignificant losses in the reel motors, the tension maintenance is obtained without loss of power. The voltage of the generator and, therefore, the strip speed remain constant during a given pass. As

the reel motors are controlled to maintain a constant current input or output, respectively, which means that these motors operate with a constant KW output. The ammeter in the reel motor circuit serves therefore as an indication of the strip tension."

 This clearly anticipates the McBain claims in so far as they relate to the means for supplying energy from the unwinding reel. But the plaintiff, replying to this, says McBain is entitled to an earlier date than that of his application because he conceived the idea of his invention in November of 1920, and sketches made by him on May 22, 1922, show that as of the latter date he did reduce his invention to graphic form. Before the plaintiff may be given the benefit of this prior date, however, it must be shown that he was reasonably diligent in reducing his invention to practice or in applying for a patent thereon. Christie v. Seybold, 6 Cir., 55 F. 69; Automatic Weighing Machine Co. v. Pneumatic Scale Corp., 1 Cir., 166 F. 288. During the years that passed between 1922, when McBain put his idea of 1920 in the form of a drawing, and 1928, when he finally applied for a patent, it is said that he was in straitened circumstances so he could not reduce his invention to use within this period. This may be true, but there is nothing in the evidence which will permit a reasonable conclusion that he was, during this time, so pinched for money that he could not afford to apply for a patent. In fact, he financed the purchase of a $10,000 home during this period.

My conclusion is that McBain, not having proceeded with due diligence in applying for his patent, is limited to the date of his application, and the German publication, being an anticipation dating upwards of a year before him, this patent is invalid.

 The close cooperation which existed between the two defendants in many of the enterprises of the American Sheet & Tin Plate Company, particularly with relation to the installations complained of in this suit, leads to the conclusion that the Tin Plate Company is, in effect, a department of the Steel Corporation. The motion to dismiss as to the United States Steel Corporation is therefore denied.

A decree will be entered in conformity with the foregoing conclusions.