**UNITED STATES v. COLD METAL PROCESS CO. et al.**

**No. 21910.**

District Court, N. D. Ohio, E. D.

Aug. 11, 1945.

Frances M. Shea, Asst. Atty. Gen., Roy C. Hackley, Jr., Sp. Asst. to Atty. Gen., Don C. Miller, U. S. Atty., of Cleveland, Ohio, and T. Hayward Brown, Atty., Dept. of Justice, of Washington, D. C., for plaintiff.

Clarence B. Zewadski, of Detroit, Mich., Franklin B. Powers, of Youngstown, Ohio, and Howard F. Burns, of Cleveland, Ohio

(Whittemore, Hulbert & Belknap, of Detroit, Mich., Manchester, Bennett, Powers & Ullman, of Youngstown, Ohio, and Baker, Hostetler & Patterson, of Cleveland, Ohio, of counsel), for defendants.

MILLER, District Judge.

This action was filed by the United States of America as plaintiff on July 27, 1943, praying cancellation of United States Letters Patent No. 1,744,016 (hereinafter referred to as '016) and Patent No. 1,779,195 (hereinafter referred to as '195) owned by the defendant The Cold Metal Process Company (hereinafter referred to as Cold Metal) assignee of the defendant Abram P. Steckel, for fraud upon the Commissioner of Patents in the procurement thereof, or, in the alternative, for mutual mistake of fact upon the part of the applicant and the Commissioner.

The complaint consists of two counts, the first count being directed to Patent '016 granted January 14, 1930, and the second count being directed to Patent '195 issued October 21, 1930. The defendants denied the allegations of fraud and mutual mistake, and alleged that even if mutual mistake existed it did not authorize the District Court to cancel the patents, or either of them, in this proceeding, and that the thirteen years delay in bringing the action was such laches as barred its present prosecution. This Court ruled in a preliminary hearing that it did not have the right to review in this action any decision of the Patent Examiner or any alleged error of judgment or law on the part of the Patent Office resulting in the granting of the two patents involved, but that the right did exist to cancel in such a proceeding as this any patent issued as the result of either fraud on the part of the applicant or of mutual mistake of fact upon the part of the applicant and the Commissioner. United States v. Cold Metal Process Company, D.C., 57 F.Supp. 317, 321. The case has accordingly been heard upon both the issue of fraud and the issue of mutual mistake.

Findings of Fact

1. The defendant Cold Metal is an Ohio corporation with its principal office and place of business at Youngstown, Ohio. The defendant Abram P. Steckel is a citizen of the United States and a resident of Youngstown, Ohio. The corporate defendant, as assignee of the defendant Steckel, is the owner of the two patents '016 and '195, granted January 14, 1930, and October 21, 1930, respectively. Both of these patents stemmed from an original application by Steckel, Serial No. 648,761, filed June 30, 1923. Patent '195 was issued upon application Serial No. 412,742, filed December 9, 1929, as a division of the original Steckel application. The defendant Cold Metal has heretofore filed an infringement suit against United Engineering and Foundry Company (hereinafter referred to as "United"), with reference to Patent '195, in which action this patent was held to be valid. Cold Metal Process Company v. United Engineering & Foundry Co., D.C., W.D.Pa., 3 F.Supp. 120; United Engineering & Foundry Co. v. Cold Metal Process Co., 3 Cir., 68 F.2d 564. It also filed an infringement suit against American Sheet and Tin Plate Company (also referred to as Carnegie-Illinois Steel Corp.) with respect to both Patents '195 and '016. In that action the District Court held Patent '195 invalid and Patent '016 valid, but upon appeal the Circuit Court of Appeals for the 3rd Circuit held both patents valid. Cold Metal Process Company v. American Sheet & Tin Plate Co., D.C.N.J., 22 F.Supp. 75; Cold Metal Process Company v. Carnegie-Illinois Steel Corp., 3 Cir., 108 F.2d 322.

Re: Patent 1,779,195

2. On June 30, 1923, the defendant Steckel filed application Serial No. 648,761 for a patent on a "Method and Apparatus for Rolling Thin Sheetlike Material." The invention referred to therein related to an improved rolling mill and method of rolling, applying particularly to the rolling of thin sheet-like material in long lengths at high speeds. The apparatus was what is commonly called a "4-high" mill, designed for cold rolling of thin narrow metal strips, and was described by Steckel in his application as follows:

"I provide working rolls having backing rolls of larger diameter and anti-friction mounting for said backing rolls of a character adapted to withstand the rolling pressures encountered and the high speeds which are employed. In a preferred form of the invention the backing rolls are provided with necks which carry the anti-friction bearings, these necks being of sufficient size to withstand the rolling pressure, and the diameter of the backing roll body relative to the diameter of the working roll being of exaggerated size so as to permit of using antifriction bearings of

sufficient size for the conditions encountered."

This application was drawn by George E. Stebbins of the law firm in Pittsburgh, Pennsylvania, then known as Byrnes, Stebbins and Parmelee. This firm later became Byrnes, Stebbins, Parmelee and Blenko, and still later Stebbins, Blenko and Webb, and will be hereinafter referred to as the Byrnes firm. Stebbins also prepared the first amendment in the application. Some time prior to April 6, 1926 Walter J. Blenko, a lawyer then employed by the Byrnes firm and from 1929 on a partner of the Byrnes firm, took charge of the Steckel application, and had charge of it, and the divisional application thereon in the Patent Office at all times thereafter. The corporate defendant Cold Metal was organized in 1926 and acquired the Steckel application at that time.

3. Steckel made his claimed invention in 1922 and built and operated his first mill as described in the application in that year. Steel rolled on the Steckel mill was sold during the years 1923 through 1926, the proceeds from such sales totalling approximately $13,000. After Cold Metal was organized it adopted the policy of showing the mill generally to the public and granting license to others. The representatives of a number of companies came to see the Steckel mill roll various types of steel, brass and nickel to thin gauges without intermediate annealing and thereafter purchased such mills and took licenses. Up to the time of this suit about 50% of the total capacity of the steel industry has taken licenses and are operating thereunder and paying substantial royalties to Cold Metal. The adoption of the Steckel mill was gradual, but by 1937 most of the old pack rolling mills in the sheet industry had been discarded, in favor of the patented mills. The cold rolled product of the patented mills was better and could be produced at lower cost. The product of the patented mills is truer to gauge, has a better surface, has better drawing qualities and has a better grain structure. Licensees included Carnegie-Illinois Steel Corporation and other subsidiaries of the United States Steel Corporation, National Steel Corporation, Inland Steel Company, Allegheny Ludlum Steel Corporation and a number of smaller producers. Infringement suits are pending against Youngstown Sheet and Tube Company, American Rolling Mill Company, Wheeling Steel Company, Jones and Laughlin Steel Corporation, Bethlehem Steel Corporation and Republic Steel Corporation.

4. On April 20, 1926, Earl Parmelee, now deceased, a member of the Byrnes firm, without any knowledge of the existence of the Steckel application, filed in the Patent Office an application in the names of Florence C. Biggert, Jr., and Lane Johnson, Serial No. 103,264, for a patent on "Improvement in Rolling Mills." Biggert was then President and Johnson was Chief Engineer of United Engineering & Foundry Company. That application described a 4-high mill with backing rolls mounted in roller bearings. This application is hereinafter referred to as the Biggert application, and was assigned by Biggert and Johnson to United. About November 1, 1926, Walter J. Blenko took charge of the Biggert application and continued in charge of the prosecution of it, and of the subsequent continuation application based thereon, in the Patent Office at all times thereafter. United was the largest builder of rolling mills in the world and by July 1927 had sold mills of the kind described in the Biggert application to the extent of more than $3,600,000. Such mills had proved successful and popular.

5. After the Biggert application was taken over by Blenko, who was at that time also handling the Steckel application, Blenko became aware that the Byrnes firm was prosecuting two applications for different clients disclosing common subject matter. Blenko promptly advised the partners of this conflict, who decided that the firm would withdraw as attorneys for both applicants unless the parties could come to some satisfactory agreement. Stebbins and Blenko thereupon conferred with Biggert and Steckel separately, advising each that both applications involved the common subject matter of 4-high mills. Disclosure was not made to either one of the name of the other applicant nor was the application of either shown to the other. The Byrnes firm advised each applicant that it would withdraw as his attorney or it would arrange a conference between the applicants if they so desired for the purpose of discussing the situation. The parties desired to meet. During May and June 1927, meetings were held between officials of Cold Metal and United, at which one or more members of the Byrnes firm were present. The positions of the parties developed as follows: United was interested in building and selling the mills, while Cold Metal was interested in collecting

royalties on the invention. Both applicants requested the Byrnes firm to continue as their respective attorneys. At a conference of the parties on June 20, 1927, in the office of the Byrnes firm in Pittsburgh, Pennsylvania, a written contract, drawn by Stebbins at the request of the parties was executed by both Cold Metal and United. This contract provided in part as follows:

"Whereas both parties own certain applications pending in the United States Patent Office relating to 4-high rolling mills and the rolling of thin material; and

"Whereas it has been suggested to the parties by their attorneys that it may be possible to secure claims to a certain subject-matter common to both parties' applications;

"Now therefore, in consideration of the sum of one dollar ($1.00) and other good and valuable consideration paid by each party to the other party, the receipt of which is hereby acknowledged, and in further consideration of the mutual covenants hereinafter contained, the parties hereto agree for themselves, their successors and assigns as follows:

"1. The parties will, through their appropriate officers, immediately hold a conference at which their patent attorneys, Byrnes, Stebbins & Parmelee, shall be authorized by both parties to suggest claims covering certain subject-matter common to both parties' applications and which it is understood are not at the present time being presented in Cold Metals' applications; together with a plan for securing the allowance of such claims;

"2. Cold Metals shall not, after such conference, present in its applications claims of the scope suggested at the conference, or directed to the subject-matter common to both parties' applications, if such claims are broader or of different scope than the claims now presented in Cold Metals' applications, except with the agreement and cooperation of United.

"3. When and if such claim or claims to common subject-matter are granted in any patent issued on Cold Metals' applications Cold Metals shall grant to United a license to make, use and sell rolling mills under such claim or claims, which license shall be exclusive to United for 4-high hot mills and for 4-high cold mills, in which the major portion of the power required by a roll stand is supplied to the rolls directly and not through tension exerted on the material for pulling it through the rolls; Cold Metals, however, reserving the right to make or have made for its own use and to use in its own plant or plants such hot and cold mills, and provided further that Cold Metal shall have the right to make, use and sell, or to license others to make, use or sell, such 4-high hot mills in combination with means for coiling the rolled strip between passes as described in the pending application of A. P. Steckel, Serial No. 198,915, filed June 15, 1927."

6. Immediately after the signing of the contract, and while the parties were still present, Stebbins stated to the parties that the conflicting subject matter related to the 4-high mill with roller bearings on the backing rolls, that the Byrnes firm believed it would be possible to get claims allowed by the Patent Office which would cover this common subject matter, that in their opinion the best plan of procedure was to go to the Patent Office, discuss the matter with the examiner and see if they could formulate claims in the Biggert and Johnson Patent application, and since at that time United had had considerable commercial success while Steckel had been operating only in a small way, they believed that with the added argument of commercial success they would impress the examiner in addition to other arguments of the patent. It was agreed by the parties that this procedure should be followed and that such claims as might be allowed in the Biggert and Johnson application and which would be broad enough to be read also on the Steckel application would be transferred into the Steckel application. The parties were told that Steckel had an earlier filing date than Biggert and Johnson, but it was not disclosed to the parties which one had the earlier date of invention. Stebbins also agreed, as required by the parties, that the Byrnes firm would prosecute the cases separately and independently as if they were being handled by different attorneys, and Blenko was so instructed. Neither party was willing that the Byrnes firm show the other party its application and, accordingly such disclosure was not made by the Byrnes firm. Cold Metal did not have access to the disclosure of the Biggert application until after the issuance of the Biggert patent on December 27, 1927. United did not have access to the disclosure of the Steckel application Serial No. 648,-761 until January 1929. United instructed its attorneys to prosecute the Biggert application diligently, as was its customary

practice in other patent applications. Following this conference Biggert, President of United, and Frank, Chairman of its Board, together with Blenko and Stebbins had an interview on June 27, 1927, at the Patent Office at which the Examiner was urged to allow a patent to Biggert on the 4-high roller-bearing mill because of the commercial success that had been attained by United in selling such mills. At that interview the Steckel application was not called to the Examiner's attention. If the attention of the Examiner had been called to the Steckel application, the Examiner might have declared an interference which would have delayed an issuance of any patent to Biggert and Johnson for some months and might have prevented its issuance altogether.

7. Pursuant to the interview of June 27, 1927, an amendment was prepared by Blenko and filed July 22, 1927 in the Biggert application with an argument for allowance of claims covering the Biggert mill. United's commercial success with that mill was urged as an element establishing that Biggert and Johnson had made a real invention. A continuation-in-part application was thereafter filed on October 24, 1927, on behalf of Biggert and Johnson and the Biggert and Johnson patent issued thereon on December 27, 1927. During the prosecution of the Biggert applications oaths were filed by Biggert and Johnson asserting in substance that they believed themselves to be the first inventors of the subject matter of the claims which were then being prosecuted and that the invention had not been on sale or in public use for more than two years prior to the date of their application. The assertions contained in the oaths were made in good faith in accordance with the routine procedure of the Patent Office necessary to continue the prosecution of their applications and were believed in by the affiants at the time they were made. These statements were considered by the Patent Office as routine and were not relied upon by it as stating the correct facts in the ultimate allowance of the patent.

8. Throughout the period from June 20, 1927, until the issuance of the Biggert patent on December 27, 1927, all of the acts of the Byrnes firm in the prosecution of the Biggert applications were done on behalf of United and not on behalf of defendants. The Byrnes firm gave consideration to the payment of the final fee on the Biggert application and concluded that it could not properly disclose the claims allowed in the Biggert application to Steckel without violating its instructions from United, and that it should proceed with the Biggert application as though it and the Steckel application were in the hands of independent law firms, and, consequently, paid the final fee and the Biggert patent issued in due course, just as it would have done if the applications had been in the hands of independent law firms.

9. After the issuance of the Biggert patent, the Byrnes firm submitted a copy of that patent to Steckel and asked him to consider whether any claims of that patent defined his invention. This was the first time that the defendants obtained knowledge of the claims allowed to Biggert. Upon examination of those claims, Steckel advised the Byrnes firm that he believed they defined his invention and that they really belonged to him. A question remained as to whether the claims had a basis in the Steckel application. That question was submitted to William B. Jaspert, an independent patent attorney of Pittsburgh, Pennsylvania, for his opinion. Jaspert reported that all of the claims, except Claim 5, of the Biggert patent had a basis of disclosure in the Steckel application. This was likewise the opinion of the Byrnes firm. Whereupon pursuant to instructions from defendants, the Byrnes firm on behalf of Cold Metal copied the claims of the Biggert patent, except Claim 5, into the Steckel application and requested that the Patent Office declare an interference, just as would have been done if the applications had been in the hands of separate law firms. The Patent Office concluded that the claims had a basis in the Steckel application and declared the interference on September 8, 1928. When the interference was declared, defendants and Biggert were notified by the Patent Office that the interference had been set up and that they were represented by the same attorneys. The Byrnes firm then communicated with United and ascertained that Biggert and Johnson's conception date was not as early as Steckel's filing date, and, consequently, advised both parties against the filing of preliminary statements. Upon that recommendation neither party filed a preliminary statement and the Patent Office in accordance with its rules of practice awarded the claims to Steckel on December 6, 1928. Notice of the declaration of the interference and also of its termination adversely to Biggert and John-

son was noted at the respective times in the file of the Biggert and Johnson patent. Subsequent to the termination of the interference and pursuant to a requirement for division made by the Patent Office, the claims awarded to Steckel in the interference were on February 21, 1929, cancelled from the original Steckel application, Serial No. 648,761, and were later embodied in a divisional application, Serial No. 412,742, on which Patent '195 issued on October 21, 1930, to Cold Metal.

10. In January 1929, following the judgment of priority in favor of Steckel in the interference, and prior to the issuance of the patent on October 21, 1930, United retained independent patent counsel to advise it in regard to the situation arising out of the Steckel-Biggert interference. On October 3, 1930, United revoked the power-of-attorney of the Byrnes firm to represent it in the Patent Office in matters concerning the Biggert and Johnson patent and substituted the firm of Brown and Critchlow, patent attorneys of Pittsburgh, Pennsylvania. On the same day United filed, through their new attorneys, appropriate pleadings in the Patent Office seeking a reopening of the interference on the ground that Steckel was not entitled to many of the claims which he had taken away from Biggert through the interference. The agreement of June 20, 1927, between Cold Metal and United and all pertinent facts in regard to the dealings between United and Cold Metal and the alleged plan were placed before the Patent Office in affidavits filed by Biggert. The petition was denied on October 8, 1930. The Commissioner of Patents, in his ruling, reviewed the record and concluded as follows:

"In view of the record as thus presented, it is not thought that it would be proper to reopen the interference and undertake to adjudicate the alleged lack of right of Steckel to make certain claims, the officers of petitioner according to the statements made in support of the petition having, since January 1929, been of the opinion that such claims, or some of them, were not supported by the disclosure of the Steckel application, in which such claims were presented, but had taken no steps to bring that matter to the attention of the Patent Office.

"The petition to reopen the interference is denied."

11. On October 10, 1930, the Commissioner of Patents wrote a letter to Byrnes, Stebbins, Parmelee and Blenko in which he referred to the recently filed petition to reopen the interference and to the affidavits filed in support thereof and called upon the attorneys to explain their conduct. The firm replied by letter of October 13, 1930, in which they took the position that—"The facts were such that it was impossible for us to follow any procedure other than that which we did follow," and that "we felt that we must prosecute the two cases in exactly the same fashion that they would have been handled had they been in the hands of separate attorneys." This letter reviewed the facts and stated in part—

"The petition which was filed in the attempt to reopen the interference did not correctly state the facts. It was not our plan to get the claims issued in Biggert and Johnson and then transfer them to Steckel. On the contrary, it was our thought that Steckel by reason of his broader disclosure and earlier filing date would probably want claims couched in broader terms than those of Biggert and Johnson. We felt that when the Biggert and Johnson patent issued the essence of the invention could then be pointed out to Steckel and he could advise us of what he deemed to be his invention along these lines. In this respect the situation was exactly the same as that which arises every day in practice before the Office. * * *

"When Biggert and Johnson issued and Steckel saw the claims he instructed us to copy them and there was no recourse but to follow his instructions. It was never our intention deliberately to take out claims in Biggert and Johnson simply with the idea of later transferring them to Steckel, but we could not in fairness to either party give him an advantage which he would not have enjoyed or put him at a disadvantage which he would not have suffered had the cases been in the hands of separate attorneys. If they had been in the hands of separate attorneys the Biggert and Johnson patent would have issued promptly, as it did, and United Engineering and Foundry Company would have had the claims. If we had brought pressure to bear upon United Engineering and Foundry Company to disclose the Biggert and Johnson claims to Steckel and thereby had provoked an interference before the issue of the Biggert and Johnson patent, we would have obviously been placing the United Engineering and Foundry Company

in a worse position than it would have been had it had another attorney."

The Commissioner very carefully considered the letter to determine whether he should permit the patent to issue in regular course or whether he should follow the course outlined in Rule 165 of the Rules of Practice, 35 U.S.C.A.Appendix, which gave the Commissioner power to withdraw an application from the allowance stage, even after the final fee has been paid, if fraud is shown. In view of the high regard which he held for Stebbins, and considering the statements made by his firm in the letter and all the facts made available to him by the record, the Commissioner of Patents put the letter away in his files and let the case take its ordinary course. The patent thereafter issued on October 21, 1930.

12. In the early part of 1928 Steckel learned of a cold rolling mill at Bridgeport, Connecticut, having relatively small work rolls, each backed up by two larger rolls, the backing rolls having their necks mounted in roller bearings, and employing tension on the delivered strip. Steckel promptly visited that mill at Bridgeport and made a thorough investigation of it. From his initial investigation he was of the opinion that it would probably prevent the issuance of a patent to him, but after a further and more thorough investigation he concluded that it would not. He and Blenko discussed the Bridgeport mill with the Examiner at the Patent Office in the prosecution of his application, and the adviser was advised of the fact that the Bridgeport mill had so-called roller bearings on the backing rolls. The Wilmot Patent No. 1,071,846, which shows the Bridgeport mill, was cited by the Patent Office in the first action on the Steckel application. Its known existence did not prevent the Patent Office from granting a patent to Steckel. The Bridgeport mill was relied upon by United in the infringement case filed against it by Cold Metal as an anticipation of the Steckel invention, but the Court held that it was not an anticipation. In the infringement case against Carnegie-Illinois Steel Corporation the Circuit Court of Appeals held Patent '195 valid.

*Re: Patent 1,774,016*

13. Steckel Patent No. 1,774,016 was issued to defendant Cold Metal Process Company, as assignee of defendant Steckel, on January 14, 1930, directly on Steckel's original application, Serial No. 648,761 filed June 30, 1923. The invention related to a new cold process for making economically thin sheet metal previously made by hot rolling in packs, notably commercial tin plate, and also contemplated a new and improved product resulting from the practice of the new method therein disclosed. Steckel's application described the process in part as follows:

"In cold rolling as heretofore practiced it has been generally considered necessary to anneal the material after it has been reduced to half its original thickness, and as a consequence great reductions by cold rolling have always required a large number of intermediate anneals. In order to prevent such hardening of the strip with the accompanying annealing, I use a roll, or preferably a pair of rolls, of comparatively small diameter. These rolls do not have the necessary strength to be self-supporting, and are therefore provided with backing rolls of large diameter and of the necessary strength to withstand the rolling pressure. The backing rolls have an anti-friction mounting. This permits the rolls to be driven principally or entirely by the tension on the delivered strip, such tension being exerted by the winding reel or by a subsequent pair of rolls. The delivered strip may, therefore, be maintained under a constant and automatically regulated tension, which is highly desirable in cold rolling as it insures straightness of the product. This tension should be substantially constant to insure uniformity of gauge. The anti-friction mounting also permits the strip to be rolled at high speed, it saves so much power that the usual mill drive may be radically simplified or even dispensed with. In the usual cold rolling mill operating on thin material, the power losses in bearing friction commonly amount to about ninety percent of the power applied, and necessitate heavy driving mechanism for the rolls.

\*　　\*　　\*　　\*　　\*

"All metals are crystalline in character and after proper treatment of a polished surface the so-called 'Micro-grains' are readily observable under a microscope. Each micrograin consists of smaller crystal cells made up of atoms disposed in definite relationship in space. The general effect of undirectional work such as rolling or wire drawing is to cause a readjustment of the crystal cells so that they approach as a limit a definite so-called 'preferred' orientation. The crystal cells of alpha iron are on the body centered cubical

system and in rolling or wire drawing these cells tend toward orientation in which the so-called directions of the crystal cells are parallel to the direction of rolling. When this condition is reached, whether in hot or cold work, no further working of the metal can be attained without fragmentation and rupture. There is a further limitation in rolling, as of sheets or strips, in that the crystal cells reach as a limit a condition wherein the cube faces lie in or parallel to the surface of the sheet or strip. Further work is had only at the expense of fragmentation or rupture.

"As these limiting conditions are approached, the amount of further work which the metal will withstand is correspondingly cut down, thus limiting the commercial application of the rolled or drawn product. Neither are the physical properties of such product uniform, longitudinally, transversely, and through the cross-section.

"While it is customary to resort to heat treatment in order to eliminate the objectionable directional properties by recrystallization of the grains, such heat treatment is invariably accompanied by grain growth, and in many cases re-crystallization in so-called 'preferred orientations'. Both these conditions are uncontrollable and undesirable. All of the disadvantages of annealing are well-known.

"My improved process results in a product having equi-axed small uniform-sized grains with random orientation. In other words, the effect of my process is to reduce and elongate the metal far beyond the limits possible by rolling processes heretofore practiced but without setting up the objectionable preferred orientation which limits further work and thus reduces the quality of the product. The character and orientation of the crystals in metals are readily ascertainable by X-ray analysis. The so-called 'powder method' is not useful in this connection but the monochromatic pin-hole method as applied to the examination of a piece of metal in the solid form reveals the character and orientation of the crystal cells. X-ray photographs of the product of my improved process taken by the monochromatic pin-hole method show concentric substantially uniformly intense continuous rings around the central undiffracted beam. There is apparently a balance of tensile and compressive forces which results in the product of my process very closely approaching if not reaching

the ideal condition in so far as grain size and crystal cell orientation is concerned."

This patent was directed to an entirely different invention than Patent '195. Its claims were not involved in the agreement between United and Cold Metal or the procedure relating to the procurement of the claims of Patent '195. Neither that agreement nor the ensuing procedure in any way induced the issuance of Patent '016 with the claims contained therein, and the prosecution of the claims of Patent '016 was separate and distinct from the prosecution of the claims to the '195 invention.

14. When first presented to the Patent Office, claims directed to such mills were repeatedly rejected for lack of patentable invention over the prior art. The Patent Office was ultimately persuaded to allow the claims by representations that the product produced by the Steckel mills was different from the product of other mills in that its crystal grains were arranged in what Steckel described as random orientation instead of the less desirable preferred orientation which normally characterized cold rolled metal. A contributing factor to the allowance of this patent was the representation of the applicant that he was the first in the history of cold rolling to effect reduction after reduction of steel without intermediate annealing. These representations were believed by Steckel to be true and correct when made and are still believed by him to be true and correct.

15. United, the world's largest mill builder, in a catalogue published by it in 1924, claimed that at that time it was commercially practical to reduce low carbon steels only 50% and that after such a reduction it was necessary to anneal the metal to permit further reductions. This was a correct statement of the art at that time.

16. In August 1921 Steckel had personally witnessed the making of reductions without intermediate annealing on the Coryell mill of the Power Engineering Company in Youngstown, Ohio, but this mill was not used in cold strip rolling but was used for rolling narrow, endless metal belts. In the operation of that mill the edges of the metal cracked and had to be sheared off and the material produced was not of a commercial character. Coryell's mill and his commercial efforts were complete failures and ended in bankruptcy. In passing on Steckel's statement that he was the first to eliminate intermediate annealing, the Patent Office had before it the

Coryell patent No. 1,618,515 and Coryell's disclosure in respect of the elimination of intermediate annealing by the use of exceedingly high tension in an ordinary plain bearing 2-high mill. The Patent Office in the exercise of its judgment found that Steckel's process and mill involved invention thereover and that Steckel's statement that he was the first to eliminate intermediate annealing was correct.

17. Lockwood of Cold Metal in March 1929 saw an article reporting a lecture given by Dr. George Clark of the University of Illinois in which he expressed the idea that if you would "fool" the molecules by drawing and rolling the metal at the same time it would not be necessary to anneal after the rolling operations. Lockwood wrote Dr. Clark on March 16, 1929, and told him that Cold Metal had been reducing strip steel by a combined drawing and rolling process and stated that Dr. Clark's theory was quite interesting. Dr. Clark then wrote to Cold Metal stating in more detail his theories and that he would be interested in making an examination of Cold Metal's product by the X-ray method. Lockwood thereupon sent Dr. Clark samples of low carbon steel reduced on the Steckel mill. Clark later asked for comparative samples rolled on other types of mills, and comparative samples, as well as many additional samples of Steckel rolled steel, were sent to Dr. Clark. Neither defendants nor their attorneys were familiar with the X-ray examination of metals or the interpretation of the pictures obtained in such an examination and relied upon Dr. Clark for a full exposition of this subject as it affected Cold Metal's problem. Dr. Clark, after examining many samples submitted to him, advised Cold Metal on May 31, 1929, and June 11, 1929, (1) that in all the samples of Steckel rolled steel some preferred orientation was retained because the proper balance of forces between rolling and tension had not exactly been reached, (2) that where these forces are properly correlated absolute random orientation will be observed, (3) that in the samples examined this condition was approached, (4) that the Steckel process produced far less preferred orientation than any other process, and (5) that Cold Metal had been "fully justified in making claims for the ideal structure to which the present product without any research at all is approaching." Dr. Clark was informed as to the operation of the Coryell mill, and samples rolled on it were examined by him by the X-ray diffraction method. He visited the plant of Cold Metal at Youngstown on July 22, 1929, and saw the Steckel mill. On this same visit to Youngstown he saw the Coryell mill. At that time, on the basis of the work which he had done, the first Clark affidavit was prepared and signed by Dr. Clark.

18. Thereafter the Clark affidavit, dated July 22, 1929, together with a suitable amendment to the Steckel application embodying certain X-ray claims, was submitted to the Patent Office. In this affidavit Clark stated that he was familiar with the Steckel process of rolling wherein the material was reduced between small work rolls with antifriction backing, the principal rolling power being supplied by tension on the delivered strip; that he had made a large number of X-ray photographs of Steckel rolled steel and had compared the same with X-ray photographs of the products of other rolling mills; that by reason of this he was qualified to state the differences between metals rolled by the Steckel process and metals which were subjected to ordinary hot or cold working operations; that in cast metals the orientation of the crystal cells is generally random or chaotic, and that the general effect of mechanical work was to cause a departure from this chaotic orientation, the crystals approaching as a limit a definite so-called preferred orientation; that in the undirectional mechanical working of iron as in rolling or wire-drawing, the crystal cells tend toward an orientation in which the directions of the crystal cells are parallel to the direction of working, and when this condition is reached, whether in hot or cold work no further working of the metal can be attained without fragmentation or rupture; that in addition to this limitation, there is in rolling, as of sheets or strips, the further limitation of crystal cells reach a point in rolling, wherein the cube faces lie in or parallel to the surface of the sheet or strip, and that when such limit is reached, further work is had only at the expense of fragmentation or rupture; that the practice in ordinary metal-working operations was to resort to heat treating to eliminate the objectional directional properties by re-crystallization of the grains; that annealing was expensive and slow; that the conditions of proper annealing were difficult to reproduce, and that the operation was usually detrimental to the surface of the material

being treated; that the ideal commercial flat metal, such as sheet, strip or bar, particularly if it was to be subjected to any deformation such as deep drawing, flanging, or seaming, would be one having equi-axed small uniform-sized grains with random orientation; that the character and orientation of the crystals in metals was readily ascertainable by X-ray analysis; and that the characteristic X-ray pattern of the ideal commercial flat metal would show concentric uniformly intense continuous rings around the central undiffracted beam. Dr. Clark accompanied his affidavit by four photographs, which were (1) a characteristic X-ray pattern of cast steel without subsequent heat treatment (2) an X-ray pattern of low-carbon shim steel produced by ordinary rolling methods, (3) an X-ray pattern for drawn high-tensile steel wire, and (4) an X-ray pattern of Steckel rolled steel. He then closed his affidavit with these statements:

"The Steckel pattern more nearly approaches the ideal X-ray pattern than any I have ever observed in my own researches or have even seen published. The sample of Figure 4 shows concentric continuous rings of substantially uniform intensity and the pattern is particularly remarkable in that the metal was not subjected to heat treatment before the pattern was taken.

"In my opinion the ideal structure is so nearly attained in the Steckel process because of the balance of tensile and compressive forces employed in the reduction of the metal. I have examined the showing of the application above identified, and in my opinion the results obtained by the Steckel process, as shown in my x-ray analyses, are inherent in the operation of the mill therein disclosed."

Thereafter on October 25, 1929, a further amendment embodying new X-ray claims was filed, together with an affidavit by Dr. Clark based upon his comparison of steel rolled on the Coryell mill with steel rolled on the Steckel mill.

19. Cold Metal had Dr. Clark continue his X-ray examinations of Steckel rolled materials and his examinations of products rolled by other mills, including certain prior art mills, for a period of several years after the patent issued. Dr. Clark in March 1930 made a report on the many samples of steel which he had examined and in that report stated that his work fully substantiated the prediction that "a far more nearly random orientation of grains would be retained for a given reduction" in the Steckel process than in the usual process. In that report he also advised Cold Metal:

"Without exception the diffraction rings for Steckel rolled sheet are more nearly continuous and uniformly intense than for sheet rolled in any other manner. * * *

"The outstanding conclusion of all X-ray studies of Steckel rolled sheets is that a more nearly random orientation of grains is retained for a given reduction than in any other case investigated."

In April 1930 Cold Metal had a public meeting in Youngstown to which it invited representatives of the principal steel companies. At this meeting Dr. Clark gave a lecture explaining his theory in regard to the superiority of the Steckel product as demonstrated by the X-ray methods. The representatives of the Steel companies were shown the Steckel mill and given samples of the products. Dr. Clark's work continued even after his report and the Youngstown meeting. On April 25, 1932, he advised Cold Metal that the product of the Steckel mill showed a higher degree of random orientation for any given reduction than material rolled on any other mill.

20. The evidence is insufficient to show that Dr. Clark did not fully believe the statements contained in his affidavits or that Cold Metal did not fully believe the statements made to the Patent Office in regard to these X-ray claims including the statements contained in the Clark affidavit. The public meeting in Youngstown in April 1930 and the correspondence between Dr. Clark, defendants and defendants' attorney both prior and subsequent to the issuance of Patent '016 show good faith on the part of Dr. Clark and the defendants and their sincerity in maintaining the validity of the X-ray claims. The representations which were made to the Patent Office in respect to the X-ray claims, including the matter added to the specifications, counsel's arguments and the Clark affidavits, were, when considered in their entirety, true, and were reasonably believed by defendants to be true.

21. The Steckel product is commercially superior to the product of the prior art mills. There is a greater randomness in the Steckel product than in the product of the prior art 2-high mills. The difference between the Steckel rolled material and that rolled on the prior art mills is due to the fact that in the Steckel process the

metal is subjected to combined rolling and tension forces which may be so related as to inhibit or retard the arrangement of the crystal cells in preferred orientation. It was Dr. Clark's conclusion from his experiments over the period involved that where metal was rolled on other types of mills there was a definite preferred orientation at a 54% reduction, whereas in the Steckel mill practically random orientation still persisted at approximately an 85% reduction; that where the metal was rolled on other types of mills a high degree of preferred orientation was obtained at a 76% reduction, whereas when rolling on the Steckel mill practically random orientation still persisted at an 85% reduction; and that it was not until the metal had been reduced 90% on the Steckel mill that the typical rolling pattern was obtained. The granting by the Patent Office of Patent '016 was not the result of a mutual mistake of fact on the part of the applicant and the Patent Office.

## Conclusions of Law and Memorandum

Briefly summarizing plaintiff's main contentions, they are as follows: With respect to Patent No. '195 the contract of June 20, 1927, and the procedure agreed upon and carried out by the parties as a result of that agreement, was in effect a fraud upon the Patent Office in procuring that patent; that the Byrnes firm prepared and filed oaths on behalf of Biggert and Johnson in the subsequent prosecution of their application which they knew to be untrue; that the Byrnes firm deceived the Commissioner of Patents by false statements in their letter to him of October 13, 1930, explaining their position in representing conflicting applicants; and that the defendants deceived the examiner by false statements after having knowledge of the invention disclosed by the Bridgeport mill; with respect to Patent '016 the defendants deceived the Patent Office by the statements that Steckel rolled steel contained random orientation instead of the usual preferred orientation, which statement was false to their knowledge; that the Clark affidavits were false in supporting that contention; and that they deceived the examiner by false statements after having knowledge of the invention disclosed by the Coryell mill. With respect to the meaning of the terms "preferred orientation" and "random orientation" plaintiff contends that the term "random orientation" means complete, 100% random orientation of the molecules, and that if preferred orientation of the molecules exists in the steel strip to any extent whatsoever "random orientation" does not exist; that as an actual fact such "random orientation" did not exist in the Steckel rolled steel; and that the representations to the Patent Office that it did exist were false and were the procuring cause for the granting of the patent. Defendants deny any improper conduct on the part of their attorneys or any false representations by either them or their attorneys, and contend that the representations and affidavits about the orientation of the molecules in Steckel rolled steel at no time claimed complete, 100% random orientation, but that the term was used, with accompanying explanations so as to correctly describe the grain structure of the steel.

■ This action is authorized by Section 41(1), Title 28 U.S.C.A. A patent by its very nature is affected with a public interest, which the Government can protect by a direct action against the patentee to cancel the patent for fraud or mutual mistake in the procurement thereof. Precision Instrument Mfg. Co. v. Automotive Maintenance Machinery Co., 65 S.Ct. 993; Hazel-Atlas Glass Co. v. Hartford-Empire Co., 322 U.S. 238, 64 S.Ct. 997, 88 L.Ed. 1250; United States v. American Bell Tel. Co., 128 U.S. 315, 9 S.Ct. 90, 32 L.Ed. 450; American Bell Tel. Co. v. United States, 159 U.S. 548, 16 S.Ct. 69, 40 L.Ed. 255; United States v. American Bell Tel. Co., 167 U.S. 224, 17 S.Ct. 809, 42 L.Ed. 144; United States v. Cold Metal Process Company, D. C., 57 F.Supp. 317.

In considering this case on its merits there are certain uncontradicted and fundamental facts that necessarily have considerable weight in any decision that is made. These will be referred to briefly.

■ The situation which gave rise to the contract of June 20, 1927, which, with the procedure which flowed from and followed that contract, is the real basis for plaintiff's charge of fraud in the procurement of Patent No. '195, was not planned by the Byrnes law firm, nor was it of their choosing, nor can they be charged with any wrongful acts because of its existence. Such a conflict of interests between clients of the same law firm, when matters for different clients are being handled by different members of the firm, can easily occur in any large law office. The usual and normal procedure in such cases is, when the conflict is discovered, either for the

lawyers to withdraw as attorneys or for the parties to come to some agreement. Accordingly, the agreement of June 20, 1927, in the present case does not have its setting or origin in any background of conspiracy or fraud. The acts of the parties thereafter must accordingly be considered in that light and be judged, not by what they would have preferred to do under ordinary circumstances, but by what existing circumstances reasonably called for after giving due consideration to the interests of all parties involved. The procedure followed by them should accordingly be scrutinized for the purpose of determining whether or not it was strictly within recognized procedure in the Patent Office instead of being condemned beforehand because of the circumstances out of which it arose. The Court believes that the situation confronting the Byrnes firm was both an embarrassing one and a difficult one to handle, and that the subsequent decision, desired and agreed to by both clients, that the firm continue to handle the two matters as if they were being handled by separate law firms, was probably a reasonable one and properly calculated to satisfactorily solve the difficulty. It would not be recommended by the Court in a case where a conflict of interest between prospective clients was recognized before employment was undertaken. But where such conflict comes to light after employment and after several years of work in the matter involved, the situation is radically different. The procedure actually followed was procedure authorized by the Patent Office; it was customarily used by other applicants; it could have been used by Cold Metal and United in the same manner as it was used in this case if Cold Metal and United had each released the Byrnes firm and thereafter employed separate attorneys to represent their respective interests. I do not construe the acts of the Byrnes firm in prosecuting the Biggert and Johnson application as being done jointly on behalf of United and Cold Metal. Those services were being performed as attorneys for United, regardless of what information they had as a result of also representing Cold Metal. They owed duties to both clients, which included the duty not to disclose information or secrets of one to the other or to use information acquired from one to the detriment of the other. In prosecuting the Biggert and Johnson application the reasonable and proper thing for them to have done was to have disclosed only what could have been or would have been disclosed by some other attorney handling the application independently of the Byrnes office.

■ These patents were granted in January and October 1930. The present action to cancel them for fraud in their procurement was not filed until July 27, 1943. During the intervening 13 years the defendant Cold Metal had instituted and successfully prosecuted two infringement suits in which most of the facts brought out in this action were fully disclosed and made matters of public record. The decision of the Circuit Court of Appeals in the United case was handed down on January 9, 1933. That opinion considered the propriety of the representation by the Byrnes firm of both Cold Metal and United and in effect approved it under the existing circumstances. The decision of the Circuit Court of Appeals in the Carnegie-Illinois Steel Corporation case was handed down on June 15, 1939, a rehearing denied on November 14, 1939, and writ of certiorari denied on February 26, 1940. 309 U.S. 665, 60 S.Ct. 590, 84 L.Ed. 1012. The validity of the patents was upheld in these two cases, yet a further delay of some two and one-half years ensued, before this proceeding was instituted. In the eventual prosecution of this action several of the patent attorneys for companies very much interested in having the patents declared invalid were in continual attendance upon the trial, and while not attorneys of record for the plaintiff, yet continuously aided and assisted the attorneys for the plaintiff in the preparation and actual trial of the case. Their interest in the case was a proper one, but at the same time it possibly helps explain the bringing of this action after so long a delay and only after unsuccessful efforts to have the patent declared invalid in previous litigation, leaving this type of action as a last hope. If the Government was as strongly convinced that these patents were procured by fraud as is now urged in this case, there has been no adequate explanation of why this action was so long delayed.

■ A number of the arguments advanced by the plaintiff have been previously decided by the rulings of the Patent Office and the decisions in the two infringement suits referred to. Those rulings are not subject to review in this proceeding. United States v. Cold Metal Process Co., D.C., 57 F.Supp. 317, 321. Such questions as whether or not statements sworn to by

the applicants and representations made to the Patent Office about the prior art, including the Bridgeport mill and the Coryell mill, have in fact been disposed of favorably to the defendants by those rulings. Both the Patent Office and the Courts have upheld their representations in those matters.

■ Giving full consideration to the foregoing fundamental facts, the Court is of the opinion that the evidence on behalf of the plaintiff falls far short of the rule which requires that fraud in such cases is not proven by a mere preponderance of the evidence but must be established by clear, unequivocal and convincing proof. Maxwell Land-Grant Co. v. United States, 121 U.S. 325, 7 S.Ct. 1015, 30 L.Ed. 949; United States v. American Bell Telephone Company, 167 U.S. 224, 17 S.Ct. 809, 42 L. Ed. 144.

■ Fraud consists of more than merely misrepresentation of a material fact. In addition to those elements it is also necessary that the complaining party be induced to act upon misrepresentations in ignorance of their falsity and also that the party charged have knowledge that the representations are false. Southern Development Company v. Silva, 125 U.S. 247, 8 S.Ct. 881, 31 L.Ed. 678; Farrar v. Churchill, 135 U.S. 609, 10 S.Ct. 771, 34 L.Ed. 246; Twachtman v. Connelly, 6 Cir., 106 F.2d 501.

■ Irrespective of the existence or nonexistence of the other elements constituting fraud in the prosecution of the '195 patent, it seems clear that the Patent Office was not in ignorance of the true facts before this patent was issued. These facts were fully disclosed in the petition to reopen the interference filed by Brown and Critchlow 'on October 3, 1930, yet the Commissioner of Patents, after giving careful consideration to the matter decided to let the patent issue nevertheless. This action in itself, irrespective of the issue of false representations, is sufficient to dismiss that portion of the complaint seeking to cancel this patent on the ground of fraud.

■ Plaintiff's contentions as to fraud or mutual mistake with respect of the X-ray subject-matter in Patent '016 are founded chiefly upon definitions of the phrases "random orientation" and "preferred orientation". It assumes that the meanings correctly attributed to these terms are in strict accordance with the testimony given by its experts in the matter. However, the Court is far from being convinced that the term "random orientation" as generally used in the art has such a narrow and strict interpretation. The plaintiff's own experts had at times previously used the term "random orientation" in a much broader sense. In any event both the application for the patent and Dr. Clark's affidavit used the term "random orientation" in a way far different from the strict definition given by the Government's experts in this case. The statements in both the application and in the affidavit must be considered in connection with the other statements contained in the same instrument. It is not proper to isolate an individual sentence in determining the meaning of any particular word used therein. Although the Steckel application states "my improved process results in a product having equi-axed small uniform-sized grains with random orientation", it immediately proceeds to state in the next sentence what is really meant by that condition, namely that "the effect of my process is to reduce and elongate the metal far beyond the limits possible by rolling processes heretofore practiced but without setting up the objectionable preferred orientation which limits further work and thus reduces the quality of the product." It will also be noted that Dr. Clark's affidavit states in its conclusion "The Steckel pattern more nearly approaches the ideal X-ray pattern than any I have ever observed in my own researches or have ever seen published." The representations thus made to the Patent Office were not the unequivocal claims of complete and perfect random orientation as is contended by the plaintiff. The long and continued research by Dr. Clark, the correspondence between him, the defendants and the defendants' attorney, and the public meeting at Youngstown in April 1930 convinced the Court that the research work by Dr. Clark was done in good faith and that the representations made to the Patent Office as a result thereof corresponded to the facts and were believed in by the parties making them. The tremendous success of the Steckel mills and the payment by licensees of royalties of many millions of dollars over the past 13 years speaks as eloquently and as forcibly as possibly could be spoken in support of Dr. Clark's conclusion that "the Steckel pattern more nearly approaches the

ideal X-ray pattern than any I have ever observed in my own researches or have ever seen published."

There was no fraud practiced upon the Patent Office in the procurement of Patent '195 and said patent should not be cancelled in this proceeding either in whole or in part.

There was no fraud practiced upon the Patent Office in the procurement of Patent '016, nor was there any mutual mistake of fact upon the part of the applicant and the Patent Office in the granting of that patent. Patent '016 should not be cancelled either in whole or in part.

The complaint will be dismissed. Counsel for defendants will tender appropriate judgment for entry.